UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ARIZONA FAMILY FLORISTS LLC, et al.,

                        Plaintiffs,                  **REPORT AND RECOMMENDATION**

          -against-                    CV 16-2638 (JMA)(AYS)

1-800-FLOWERS.COM, INC., et al.,

                       Defendants.
-----------------------------------------------------------X

**SHIELDS, Magistrate Judge:**

This case arises from disputes related to a business relationship and a series of contracts between Plaintiffs/Counter-Defendants Arizona Family Florists, LLC, Bradley and Cheryl Denham (collectively the "Arizona Plaintiffs"), Water Mill Flowers, Inc., Thomas Dowd and Cesar Rivera (collectively the "Water Mill Plaintiffs"), and Defendants Christopher McCann ("McCann"), Mark Nance ("Nance"), and Ted Marlowe ("Marlowe"), and Defendants/Counterclaimants 1-800-Flowers.com, Inc., 1-800 Flowers.com Franchise Co., Inc., and BloomNet, Inc. ("1-800-Flowers" or the "Defendants").

Presently before the Court, on referral from the Honorable Joan M. Azrack for Report and Recommendation, are the parties' cross-motions for summary judgment, appearing as Docket Entries ("DE") 72 and 82.

<u>SUMMARY OF RULINGS</u>

For the reasons set forth below, the Court rules as follows:

- Defendants' motion for summary judgment as to the First Claim (for breach of contract) is DENIED.

- Defendants' motion for summary judgment as to Second Claim (for breach of the covenant of good faith and fair dealing), is GRANTED in part and DENIED in part.

- Defendants' motion for summary judgment as to the Third Claim (for common law unfair competition) is GRANTED.

- Defendants' motion for summary judgment as to the Fourth, Fifth and Sixth Claims (for breach of contract) is GRANTED.

- Defendants' motion for summary judgment as to the Seventh, Eighth and Ninth Claims (for violation of the New York State Franchise Sales Act) is DENIED.

- Defendants' motion for summary judgment as to the Tenth Claim (for violation of the Arizona Consumer Fraud Act) is DENIED.

- Defendants' motion for summary judgment as to the Eleventh Claim (for violation of the Florida Deceptive and Unfair Trade Practices Act) is GRANTED in part and DENIED in part.

- Defendants' motion for summary judgment as to the Twelfth Claim (for common law fraud) is DENIED.

- Defendants' motion for summary judgment as to the Thirteenth Claim (for common law negligent misrepresentation) is DENIED.

- Defendants' motion for summary judgment as to the Fourteenth Claim (for common law fraudulent inducement) is GRANTED.

- Defendants' motion for summary judgment as to the Fifteenth Claim (for conversion) is DENIED.

- Defendants' motion for summary judgment as to the Seventeenth, Eighteenth and Nineteenth Claim (for accounting, declaratory judgment and permanent injunction) is DENIED without prejudice to renew, as these "claims for relief" are not separate causes of action. If Plaintiff prevails at trial, these forms of relief may be granted, if appropriate

but they do not state a claim for separate causes of action, and are certainly not proper for summary adjudication.

- Plaintiffs' motion for summary judgment as to the Seventh and Eight Claims (for violation of the New York State Franchise Sales Act) is DENIED.

- Plaintiffs' motion for summary judgment dismissing Defendants' counterclaims is DENIED in its entirety.

As a consequence of these rulings, Plaintiffs will proceed to trial on their first breach of contract claims, i.e., claims that they are owed sums of money with respect to contracts that did not expire. All claims based upon any theory that expired contracts were extended by a different contract (with a different term) are dismissed. Plaintiffs will also proceed to trial on several particular claims alleging breach of implied duties of good faith and fair dealing, except for any claim based upon Defendants' reconciliation procedures, and the Arizona Plaintiffs' claims as set forth below. They will also proceed to trial with respect to several claims alleging misrepresentations in conjunction with their Fruit Bouquet businesses, as well as their claims under the New York State Franchise Sales Act.

Defendants will proceed to trial on their counterclaims that all Plaintiffs failed to report and pay fees and royalties under the parties' contracts. They will also proceed to trial on their claims against the Arizona Plaintiffs alleging violation of the Arizona FA and their Lanham Act claims.

## FACTUAL BACKGROUND

I.    Basis of Facts Recited Herein

In support of their motions, Plaintiffs and Defendants have filed statements of fact in accordance with Rule 56.1 of the Local Rules of the United States District Courts for the

Southern and Eastern Districts of New York ("Rule. 56.1").  Under Rule 56.1, a party moving for summary judgment is required to submit a statement of material facts as to which the moving party contends there is no genuine fact to be tried.  A party opposing summary judgment must submit its own counter-statement of facts, setting forth areas of agreement, as well as those as to which there is dispute.  As further required by Rule 56.1, each statement set forth by the moving party or opponent must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).

Defendants failed to fully comply with Rule 56.1 by neglecting to include a citation to evidence which would be admissible following each of their statements.[1]  To ease the Court's references herein, the Court cites to Plaintiffs' Counterstatement and Statement of Material Facts. DE 87.[2]  In addition to the documents submitted, the facts set forth below have also been gleaned from representations made by the parties at oral argument of these motions, which was held on February 14, 2020.

---

[1]    In their papers and at oral argument the parties accused each other of filing blunderbuss motions, throwing everything against the wall to see what sticks, and arguing everything but the kitchen sink. The Court agrees.

    Additionally, the parties clearly availed themselves of Judge Bianco's generous grant to exceed his 25-page limit on memoranda of law. While the excessive filings here are somewhat attributable to the number of claims and counterclaims alleged, Plaintiffs' 152-page memorandum of law was particularly unwieldy.

[2]    Unless otherwise indicated, references in the form "DE 87" refer to Plaintiffs' Counterstatement and Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment, which can be found at page 16 of DE 87.

II.      Factual Background

    A.      The Parties

    1.      Plaintiffs/Counter-Defendants: The Arizona and Water Mill Plaintiffs

Plaintiff and Counter-Defendant Arizona Family Florists LLC ("Arizona") is an Arizona limited liability company.  DE 87 at ¶ 1.  Plaintiffs and Counter-Defendants Bradley and Cheryl Denham (collectively the "Denhams") are residents of Arizona.  Id. at ¶ 2 (together with Arizona, as stated above, the "Arizona Plaintiffs").  Plaintiff and Counter-Defendant Water Mill Flowers, Inc. ("Water Mill") is a Florida corporation.  Id. at ¶ 3.  Plaintiffs and Counter-Defendants Thomas Dowd ("Dowd") and Cesar Rivera ("Rivera") are residents of Florida.  Id. at ¶ 4 (together with Water Mill, as stated above, the "Water Mill Plaintiffs").

    2.      Defendants/Counterclaimants: 1-800 Flowers,
           Related Corporate Entities and the Individual Defendants

    i.      The Defendants

Defendant and Counterclaimant 1-800-Flowers.com, Inc. ("1-800-Flowers") is a Delaware corporation with its principal place of business in New York.  Id. at ¶ 5.  1-800-Flowers acts as a floral retailer and distribution company through certain of its subsidiaries.  Id. at ¶12, DE 94[3] at ¶ 12.  1-800-Flowers is also a retailer and distributor of fruit arrangements called "Fruit Bouquets."  DE 87 at ¶ 13.  1-800-Flowers also holds the "Fruit Bouquets by 1-800-Flowers.com" trademark.  Id. at 14.

Defendant and Counterclaimant 1-800-Flowers.com Franchise Co., Inc. ("1-800-Flowers Franchise") is a Delaware corporation with its principle place of business in New York.

---

[3] "DE 94" refers to Defendants' Response and Counter-Statement of Facts in Opposition to Plaintiffs' Cross-Motion for Summary Judgment.  Citations to DE 94 may reference both the cited paragraph and Defendants' response to the cited paragraph.

Defendant and Counterclaimant BloomNet, Inc. ("BloomNet") is a Delaware corporation with its principal place of business in New York. Id. at ¶ 7. McCann has been the President of 1-800-Flowers since September 2000. Id. at ¶ 8. Defendant Nance has been the President of BloomNet since December 2004. Id. at ¶ 9. Marlowe has been the Vice President of Retail & Franchising for 1-800-Flowers since October 2007. Id. at ¶ 10. McCann, Nance, and Marlowe all maintain their principal place of business at One Old Country Road, Suite 500, Carle Place, New York 11514. Id. at ¶ 11.

ii.    Defendants' Business

1-800-Flowers franchises both retail stores that sell flowers and retail stores that sell "Fruit Bouquets" through its subsidiary 1-800-Flowers Franchise. Id. at ¶ 16. A customer may place an order with 1-800-Flowers either through the internet or by telephone. Id. at ¶ 15. 1-800-Flowers Franchise also offers area development agreements for the establishment and operation of a specified number of franchised units. Id. at ¶ 17. BloomNet is another subsidiary of 1-800-Flowers. Id. at ¶ 18. BloomNet operates BloomNet Network, which is a wire network used to distribute floral orders received by 1-800-Flowers for fulfillment and delivery. Id. 1-800-Flowers franchisees are required to be members of the BloomNet Network. Id. at ¶ 19.

B.    The Arizona Contracts

The Arizona Plaintiffs appear to have enjoyed a profitable business relationship over the several years they were in business with the Defendants. During that business relationship (from 2010 to December of 2016) Defendants provided the Arizona Plaintiffs with over $3 million per year in customer orders. Id. at ¶ 34. The Arizona Plaintiffs state that they invested over half a million dollars in the expansion of their Phoenix operations in 2014. DE 94 ¶ 79. They contend that Defendants supported and encouraged their expansion while Defendants state that the scope

of the expansion was determined by the Arizona Plaintiffs alone.  Id.  In support of their characterization of the parties' business relationship, the Arizona Plaintiffs note that after the 2014 expansion of Lux Florist (a wedding flower business opened by the Denhams), the Corporate Defendants continued to give the Arizona Plaintiffs support, encouragement, and publicity for both Lux Florist and Arizona Flower market (the Denhams' wholesale flower business).  DE 87 ¶ 80.  Defendants are alleged to have supported the Arizona Plaintiffs' approach to business. and to have suggested that other franchisees emulate their business model. Id.  Additionally, the Arizona Plaintiffs have received awards from the Corporate Defendants and other floral wire services and organizations.

Over the years, the business relationship between the Arizona Plaintiffs and Defendants was governed by a series of contracts. Specifically, the Denhams entered into: (1) a Local Fulfillment Center/Satellite Franchise Agreement (the "Arizona LFC/SFA") with 1-800-Flowers.com Franchise Co., Inc.  Id. at ¶ 20; (2) an Asset Purchase Agreement (the "Arizona APA") with 1-800-Flowers.com Franchise Co., Inc.; (3) an Area Development Agreement (the "Arizona ADA") with 1-800-Flowers.com Franchise Co., Inc.; (4) an Order Fulfillment Agreement (the "Arizona OFA") with BloomNet.  DE 87 at ¶ 22, (5) a Franchise Agreement (the "Arizona FA") with 1-800 Flowers.com Franchise Co., Inc., and (6) an agreement with BloomNet, referred to below as the BloomNet Agreement. This agreement governs, inter alia, the conduct of the parties with respect to wire orders and the payment thereof. DE 107-1. As discussed below, each of these agreements address different areas of the parties' business arrangement, had different provisions, and different dates of expiration.

1.    The Arizona LFC/SFA

Under the Arizona LFC/SFA, the Denhams operated a local fulfillment center in Mesa, Arizona (the "Mesa Center").  Id.  The Arizona LFC/SFA provided that the Denhams would receive 1-800-Flowers orders to fulfill with a minimum merchandise value of $1 million per year.  DE 83 (Einbinder Decl.) Ex. A at 10.  Specifically, the Arizona LFC/SFA provided:

> 1-800-FLOWERS shall use commercially reasonable efforts to forward to OPERATOR for fulfillment orders for floral products with an estimated minimum Merchandise Value of $1,000,000.00 the 'Minimum Merchandise Value 'during each subsequent twelve (12) month period commencing on the date of the opening of the Local Fulfillment Center and during each subsequent twelve (12) month period thereafter, or any pro-rated share for any such twelve (12) month period during which this Agreement is terminated.

Id.

The Arizona LFC/SFA was entered into on June 22, 2004.  By its terms, it was set to expire on June 22, 2014. There is no document before the Court extending the term of that contract. Any argument extending that term is wholly dependent upon the Arizona Plaintiffs' argument that the terms of the Arizona FA, discussed below, are somehow incorporated into this contract.

2.    The Arizona APA, the Arizona ADA, and the Arizona OFA

On March 7, 2007, the Denhams entered into the Arizona APA, the Arizona ADA, and the Arizona OFA.  DE 87 at ¶ 22.  Under those agreements, the Denhams operated a local fulfillment center in Phoenix, Arizona (the "WRGL Center").  Id.

The Arizona OFA provided that the Denhams would receive at least 69% of the aggregated orders each year from customers in an area comprised of designated zip codes to fulfill, which the parties estimated to have a value of $2,000,000, as of the date of the agreement. Einbinder Decl. Ex. M at 3; Ex. A.

Between 2006 and 2007, 1-800-Flowers Franchising and the Denhams entered into four Satellite Franchise Agreements for satellite stores.  DE 87 at ¶ 24.  The four satellite stores closed with the consent of 1-800-Flowers, 1-800-Flowers Franchise, and BloomNet (the "Corporate Defendants").  Id. at ¶ 25.

In the fall of 2010, the Denhams consolidated the business operations of the Mesa Center and WRGL Center into a new facility in Phoenix, Arizona (the "Phoenix Center").  Id. ¶ 26.  The Denhams did so with the consent of Defendants.  Id.

By its terms, the Arizona OFA was set to expire on May 7, 2012. There is no document before the Court extending the term of that contract. Any argument extending that term is wholly dependent upon Plaintiffs' argument that the Arizona FA, discussed below, somehow incorporated its term into this contract.[4]

3.    The Arizona FA

On November 1, 2010, the Denhams entered into the Arizona FA with 1-800-Flowers.com Franchise Co., Inc.  Id. at ¶ 27.  The Denhams transferred their rights under the Arizona FA to Plaintiff Arizona Family Florists.  Id.  Under the Arizona FA, the Denhams opened a satellite store and operated that store out of the Phoenix Center, along with the Denham's order fulfillment operations.  Id. at ¶ 30.

By its terms, the Arizona FA expires in November of 2020.  Einbinder Decl. Ex. P at Denham0003975.

---

[4]    There is a dispute regarding whether Defendants made an offer to enter into a new OFA in the context of settlement negotiations. This issue of fact is not material to the Court's decision herein. It is therefore unnecessary, at this point in the proceedings, to decide whether discussions regarding extension of the OFA took place before or after settlement negotiations. At most, this issue might be necessary to decide at trial, when admissibility is at issue.

4.    The Arizona BloomNet Agreement

On September 21, 2010 Cheryl Denham executed the Arizona BloomNet Agreement on behalf of Plaintiff Arizona Family Florist.  DE 74-8 (Walker Decl. Ex. H); DE 107-1.[5] When a customer paid for a wire order that the Plaintiffs fulfilled, that payment went directly to the Defendants.  DE 87 ¶ 86. The Arizona BloomNet Agreement sets forth terms regarding such orders. Specifically, franchisees were required to reconcile orders each month to determine if they had been properly paid for the orders they fulfilled.  Id. ¶ 88.

Sections (1) and (5) of the "Clearing House Statement" contained within the Arizona BloomNet Agreement speak specifically to the order reconciliation process.  DE 107-1. Thus, these subsections state:

> (1) BloomNet guarantees payment of all successfully delivered floral wire orders if they are reported within ninety (90) days of any BloomNet Florist listed in the current BN Directory from the time the order was delivered . . . .
>
> (5)  Disputes and requests for credits on an order received from 1800flowers.com must be submitted to floriststatementinquiries@1800flowers.com on an order received from another BloomNet Florist disputes must be submitted to customerservice@BloomNet.net within (30) days of receipt of the statement in question.

DE 107-1.

Section 9 of the "General" provisions in the BloomNet Agreement speaks directly to the issue of "fee changes." That section states:

> Bloomnet reserves the right to amend or change the rules, rates, fees, commissions and charges now existing at any time or as in effect from time to time.  Changes will be published in the

---

[5]    This critical agreement was initially buried within the reams of paper and boxes of documents submitted by counsel in connection with this motion. The copy provided to the Court was also completely illegible. For reasons unclear to the court, it was initially filed under seal. A legible version has since been filed, with only personal, immaterial information redacted.

> Directory, mailed or sent through BloomLink to members.
> Amendments or changes shall be effective on the first day of the
> month following being published in print or online.

DE 107-1.

### C.    The Water Mill Contracts

On December 21, 2006, the Water Mill Plaintiffs entered into three agreements which enabled them to operate a local fulfillment center in Fort Lauderdale, Florida (the "Fort Lauderdale Center"). DE 94 ¶ 42. Specifically, they entered into an Asset Purchase Agreement (the "Water Mill APA") with 1-800-Flowers.com Franchise Co., Inc. and 1-800-Flowers Retail, Inc., an Area Development Agreement (the "Water Mill ADA") with 1-800-Flowers.com Franchise Co., Inc., and an Order Fulfillment Agreement (the "Water Mill OFA") with BloomNet Exchange, Inc. Id. They also entered into a Franchise Agreement, dated August 29, 2008 (the "Water Mill FA") with 1-800-Flowers.com Franchise Co., Inc., and a BloomNet Agreement governed by the same terms as the Arizona BloomNet Agreement.

### 1.    The Watermill OFA

The Water Mill OFA provided that "1-800 Flowers shall use commercially reasonable efforts to forward" 57% of the aggregated orders for certain zip codes to Dowd and Rivera. Einbinder Decl. Ex. ZZ. Dowd and Rivera assigned the Water Mill ADA and the Water Mill OFA to Water Mill, by an Assignment of Franchise Agreement dated August 29, 2008. DE 94 ¶ 44. The term of the Water Mill OFA was extended until December 31, 2015 by Amendment to the Water Mill OFA dated December 31, 2010. Id. ¶ 48.

### 2.    The Watermill FA

The Watermill FA is dated August 29, 2008 (the "Water Mill FA"), and was entered into with 1-800-Flowers.com Franchise Co., Inc. Id. ¶ 45. It was assigned to Water Mill, with the

consent of 1-800-Flowers.com Franchise Co., Inc., through an Assignment of Franchise Agreement dated August 29, 2008.  Id. ¶ 45.  The Water Mill Plaintiffs' satellite store, which was opened pursuant to the Water Mill FA, was closed in June 2011.  Id. ¶ 46.  The Fort Lauderdale Center was relocated in or about September 2010.  Id. ¶ 47.  Defendants continued to collect royalties on sales of floral orders until August, 2015.  DE 94 ¶ 49.  The Corporate Defendants provided the Water Mill Plaintiffs with customer orders until October 2016.  DE 87 ¶ 50.

       3.     The Water Mill BloomNet Agreement

On December 20, 2006 Dowd, executed a BloomNet "Application for Membership" (the "Water Mill BloomNet Agreement") on behalf of Plaintiff Water Mill Flowers.  DE 74-9.  The terms of the Water Mill BloomNet Agreement are the same as the terms of the Arizona BloomNet Agreement.  DE 87 p. 11 ¶ 36. Accordingly, both sets of Plaintiffs BloomNet Agreements are referred to herein simply as the "BloomNet Agreements."

       D.     The Plaintiffs' Participation in the Fruit Bouquets Business

1-800-Flowers is a retailer and distributor of fruit arrangements called "Fruit Bouquets" through certain of its subsidiaries.  DE 94 ¶ 13. It held a franchisee meeting on March 11, 2011, in Las Vegas, Nevada where the meeting attendees discussed Fruit Bouquets.  DE 94 ¶ 55. Plaintiffs and individual defendants McCann, Nance, and Marlowe attended the meeting.  Id.  At that meeting, Defendants advised floral franchisees like Plaintiffs, that fruit orders would be "incremental." This meant that sales of fruit bouquets would increase their market share, and would not result in diminished floral orders.  Id.  As succinctly stated at oral argument, Plaintiffs were assured that the fruit business would not "cannibalize" the flower business. The purchase of

a Fruit Bouquets "Starter Kit" was required to sell Fruit Bouquets.  DE 87 ¶ 58.  The parties dispute whether the franchisees were pressured to sell Fruit Bouquets.  DE 94 ¶ 62.

The Arizona Plaintiffs and Water Mill Plaintiffs orally agreed to sell Fruit Bouquets.  Id. ¶ 63–64.  Defendants appear to dispute whether Defendants granted the Arizona and Water Mill Plaintiffs the right to utilize their trademark.  Id.  In order to sell Fruit Bouquets it was necessary to first construct a Fruit Kitchen.  DE 87 ¶ 66, The Arizona Plaintiffs and Water Mill Plaintiffs each purchased the Fruit Bouquets "Starter Kit" and underwent training on how to make Fruit Bouquets.  DE 87 ¶¶ 68–69. Both the Arizona Plaintiffs and Water Mill Plaintiffs constructed a Fruit Kitchen to sell Fruit Bouquets. In or around October 2014, the Arizona Plaintiffs and Corporate Defendants discussed the Arizona Plaintiffs being allowed to use Fruit Bouquets products to build a local fruit business.  DE 87 ¶ 83.  The parties dispute whether the Arizona Plaintiffs developed or sold their own products or designs under the "Fantastic Fruits" brand. Id. ¶ 84.They also dispute whether the Arizona Plaintiffs built their Fruit Kitchen to sell their own "Fantastic Fruit" brand.  DE 94 ¶ 67.

On April 24, 2015, Defendants sent the Arizona Plaintiffs Fruit Bouquets agreements to sign.  Id. ¶ 70.[6]  At that point, the Arizona Plaintiffs had already begun selling Fruit Bouquets.  Id.  The Arizona Plaintiffs did not sign the agreements.  Id.  The parties dispute whether the Arizona Plaintiffs and Water Mill Plaintiffs paid royalties on their respective sales of Fruit Bouquets.  DE 94 ¶ 71. Defendants state that they tracked fruit and floral orders by preparing and reviewing reports. Id. ¶¶ 72–73.

---

[6] These agreements included an Amendment to Franchise Agreement (to extend the Franchise Agreement to the Fruit Bouquet line of business), a Fruit Bouquet Order Fulfillment Agreement, and a Fruit Bouquet Image License Agreement.  See Exhibit EE to Einbinder Decl (DE 84-5).

The Arizona Plaintiffs sold Fruit Bouquets between October of 2014 and July 2015.  DE 87 ¶ 75.  The Water Mill Plaintiffs sold Fruit Bouquets between July 2011 and July 2015.  Id. ¶ 76.

     E.      <u>The Parties' Positions Regarding Statements as to the Fruit Bouquet Business</u>

Plaintiffs' allege, throughout this litigation, that Defendants made improper representations about the fruit business (the "Fruit Bouquet Misrepresentations"). More specifically, Plaintiffs contend that Defendants advised them that fruit orders would be incremental, meaning as stated above, that such sales would increase Plaintiffs' market share, and would not result in diminished floral orders. The parties dispute whether the Plaintiffs received any statement setting forth the data, methods, and computations on which sales of Fruit Bouquets were based.  DE 94 at ¶ 56. The parties also dispute whether the Fruit Bouquets business was described as a "product line" or as a "new business."  Id. ¶ 57.  Defendants argue that any representations regarding fruit bouquets could not be false because fruit bouquet orders were indeed incremental.  The parties are in sharp disagreement as to whether representations were made and whether, in fact, Fruit Bouquet orders were incremental.

With respect to this issue, Defendants offer the testimony of Vice President of Florist Fulfillment Operations and Fruit Bouquets, Camilo Escobar ("Escobar"), to support their argument that Fruit Bouquet orders were incremental. Escobar testified that if a florist received a fruit bouquet order and that order counted towards the florist's allocation for floral orders, then the fruit bouquet order would not be incremental to the floral orders.  Walker Aff. Ex. S at 95:12–97:10. He further testified that 1-800-Flowers implemented a technology that separately counted Fruit Bouquet and floral orders in the "very beginning of 2012" and that such technology remains in place. Id.

14

Plaintiffs argue that there is a question of fact as to whether fruit bouquet orders were incremental. They note that Escobar "testified repeatedly during his deposition about his ability to prepare reports" regarding order allocations, but that Defendants "never produced any responsive materials to support their alleged defense that orders were in fact incremental." For their part, the Arizona Plaintiffs cite to their expert's report, and to Bradley Denham's declaration to support their contention that fruit orders were not incremental. Both Mr. Denham's declaration and Plaintiffs' expert report provide facts supporting the contention that the Arizona Plaintiffs' floral order profits decreased when the Fruit Bouquet order program was initiated.

F.    Allegations Regarding Royalties

The Arizona Plaintiffs argue that 1-800-Flowers improperly charged royalties on sales from Lux Florist and Arizona Flower Market until August 6, 2015, when they sent an e-mail demanding that this practice stop, and that improperly collected royalties be returned. Such royalties were not returned. DE 94 ¶ 82. Defendants contend that the Arizona Plaintiffs were properly paying fees on sales from Lux and Arizona Flower market pursuant to their Franchise Agreement. Id. Like the Arizona Plaintiffs, The Water Mill Plaintiffs claim the Defendants improperly collected royalties. Defendants, on the other hand, assert counterclaims based on the allegation that all Plaintiffs owe them royalties and fees.

G.    The Closure of the Arizona Franchise

On October 18, 2016, 1-800-Flowers faxed a letter to the Arizona Plaintiffs stating that it would stop sending orders for fulfillment after December 1, 2016. DE 87 ¶ 94. On November 26, 2016, Plaintiffs' counsel, James Goniea, sent a letter to Defendants' counsel, Mr. Robert Walker, stating:

> [O]ur clients are in receipt of the letter from your clients, dated
> October 18, 2016, which states their intent to cease sending orders

15

> to our clients for fulfillment beginning on December 1, 2016. Under the franchise model developed by your clients, our clients' 1-800-Flowers franchised satellite retail location cannot remain viable without the orders it was guaranteed to receive by virtue of the [local fulfillment center/satellite franchise agreement dated May 7, 2007 with amendment and addendum and the order fulfillment agreement]. Accordingly, your clients' letter constitutes their anticipatory material breach of [the agreements] between the parties.

Einbinder Decl. Ex. KK.  The Arizona Plaintiffs stopped doing business with Defendants after December 1, 2016. They take the postion that when Defendants stopped sending orders it became impossible for them to continue business under the Arizona FA. Thus, despite the fact that the Arizona FA will not expire until November of 2020, the Arizona Plaintiffs stopped doing business under that agreement after December 1, 2016. At oral argument they appeared to take the position that they had to close their Phoenix franchise store after that date.

Defendants take the position that business under the Arizona FA took up only a portion of store space in Phoenix, and that even though orders were not sent, the Arizona Plaintiffs continued to be able to do business at their Phoenix location. Additionally, Defendants assert counterclaims based on the argument that the Arizona Plaintiffs breached the Arizona FA by closing the Phoenix store.

H.     The Trademark Dispute

In addition to their disputes regarding Defendants' decision to stop sending orders to the Arizona Plaintiffs, there arose a dispute over the use of Defendants' trademark. As to that quarrel, the parties dispute whether the lettering "1-800-Flowers" had been sufficiently removed from the Arizona Plaintiffs' building after the Arizona Plaintiffs were advised that their relationship with Defendants would be terminated. Defendants argue further that the Arizona

Plaintiffs wrongfully used the 1-800-Flowers mark and protected logos on their website.  DE 94 ¶ 101–105.

III.     Procedural History

On May 24, 2016, Plaintiffs sued Defendants in this court for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, for an accounting, for violation of consumer fraud acts, declaratory judgment, and a permanent injunction.  DE 1.  On October 26, 2016, Plaintiffs sought a preliminary injunction against Defendants to prevent them from altering the status quo of the parties 'relationship.  DE 20. Then-assigned District Judge Joseph F. Bianco denied Plaintiffs' motion for preliminary injunctive relief on November 22, 2016.  DE 30.  Plaintiffs amended their Complaint on two occasions to add claims for negligent misrepresentation, fraud, and violations of the New York State Franchise Law.

The currently operative pleading is Plaintiffs' Second Amended Complaint. DE 47. That pleading contains eighteen claims for relief. Not to be outdone, Defendants have asserted twenty-eight affirmative defenses, fourteen counterclaims against the Arizona Plaintiffs (thirteen based upon based upon breach of contract, and one based upon trademark infringement), three breach of contract counterclaims against the Watermill Plaintiffs, and one breach of contract counterclaim against all Plaintiffs. For a lawsuit that is essentially one based upon the breakdown of business relationships among three entities, the pleadings in this action are dizzying. Even Defendants appear to have become confused, naming two counterclaims against the Watermill Defendants as the "thirteenth."

Fortunately for the Court, Defendants conceded at oral argument that many of their counterclaims are really best described as stating nothing more than the factually opposite position from those asserted by Plaintiffs. Recognizing this, Defendants submitted a letter dated

February 17, 2020 stating that the counterclaims that Defendants are pursuing are breach of contract claims alleging that all Plaintiffs failed to report and pay fees and royalties under the agreements in issue and that the Arizona Plaintiffs improperly terminated the 2010 Franchise Agreement, as well as their trademark claims.

The parties completed discovery on March 27, 2018. They thereafter moved for summary judgment. Oral argument before Judge Bianco was held. The case was thereafter re-assigned to the Honorable Joan M. Azrack, who referred the motions to this Court for Report and Recommendation. As noted, this Court held oral argument on February 14, 2020.

IV.    The Motions for Summary Judgment

      A.    Defendants' Motion

Defendants seek summary judgment on each of Plaintiffs' claims. Generally, they argue that Plaintiffs' contract-based claims are governed by the unambiguous terms of the parties' contracts, and that Plaintiffs' tort claims are foreclosed by the parties' agreements or by clear law.

Plaintiffs argue that their claims are not foreclosed by the parties' agreements. They state that Defendants failed to support their motion with proper evidence, and specifically take issue with the Walker affirmation and allegedly inadmissible settlement discussions.[7] They deny the assertion that they have abandoned any claims that are not referenced specifically in their Expert Report.

---

[7]    As set forth in footnote 4 above, any dispute regarding settlement discussions is immaterial to the holdings herein.

B.    Plaintiffs' Motion

1.    Summary Judgment as to Franchise Sales Act Claims

The Arizona Plaintiffs move for summary judgment as to two of their three claims that Defendants violated the New York State Franchise Sales Act (the "FSA") (the seventh and eighth claims). As noted above, Defendants move for summary judgment as to all three of the Arizona Plaintiffs' claims pursuant to the FSA (the seventh, eighth and ninth claims).

2.    Summary Judgment Dismissing Defendants' Counterclaims

Plaintiffs also move for summary judgment dismissing all of Defendants' counterclaims. As noted, Defendants have indicated the categories of claims that they will pursue. Those are their contract counterclaims alleging that all Plaintiffs failed to report and pay fees and royalties under the agreements in issue and that the Arizona Plaintiffs improperly terminated the 2010 Franchise Agreement, as well as their trademark claims.

Plaintiffs seek summary judgment with respect to the contract-based counterclaims on the grounds that the facts show no breach. They move for summary judgment as to Defendants' trademark counterclaims on the grounds that they properly covered up the 1-800 Flowers signs on their store, and that any use of Defendants' trademark on their website with respect to awards earned is permissible as a matter of law.

3.    Summary Judgment as to Defendants' Affirmative Defenses

Finally, Plaintiffs move for summary judgment dismissing all of Defendants' affirmative defenses. There was a discussion at oral argument about these affirmative defenses, which include those generally alleged at the pleadings stage in most litigation, such as a broad assertion that a plaintiff's action is barred by the statute of limitations or laches.

Plaintiffs go to great lengths arguing that each affirmative defense must be dismissed. See DE 82 at pages 55–74. Defendants respond that while many of the affirmative defenses pleaded are those routinely set forth in most litigation, they have integrated several (including several distinct arguments with respect to the statute of limitations) in their arguments in support of their motion for summary judgment. The Court agrees that many have been so integrated and, given the detail of the claims addressed herein, finds it unnecessary to address each affirmative defense separately. To the extent that a particular affirmative defense is not proven at trial, Plaintiffs should be granted leave to move to dismiss such defense and/or object to any such defense being presented to the jury.

With the foregoing facts and the parties' motions in mind, the Court turns to the merits of the parties' positions.

<u>DISCUSSION</u>

I.    <u>Legal Principles</u>

A.    <u>Standards on Summary Judgment</u>

Summary judgment is appropriately granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted). "A fact is material if it 'might affect the outcome of the suit under the governing law[.]" <u>Baldwin v. EMI</u>

Feist Catalog, Inc., 805 F.3d 18, 25 (2d Cir. 2015) (quoting Anderson, 477 U.S. at 248, 106 S. Ct. 2505).

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the non-moving party," Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay, 868 F.3d 104, 109 (2d Cir. 2017) (quotations, alterations and citation omitted). Thus, the Court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Davis-Garett v. Urban Outfitters, Inc., 921 F.3d 30, 45 (2d Cir. 2019) (quotations and citation omitted).

"A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Pollard v. New York Methodist Hosp., 861 F.3d 374, 378 (2d Cir. 2017) (quoting Anderson, 477 U.S. at 248, 106 S. Ct. 2505). The burden of showing an absence of genuine dispute as to a material fact lies with the moving party. CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013) (quotations, brackets and citation omitted). The nonmoving party can only defeat summary judgment "by adduc[ing] evidence on which the jury could reasonably find for that party." Lyons v. Lancer Ins. Co., 681 F.3d 50, 56 (2d Cir. 2012) (quotations, brackets and citation omitted). "'The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient' to defeat a summary judgment motion[,]" Fabrikant v. French, 691 F.3d 193, 205 (2d Cir. 2012) (quoting Anderson, 477 U.S. at 252); and "[a] court cannot credit a plaintiff's merely speculative or conclusory assertions." DiStiso v. Cook, 691 F.3d 226, 230 (2d Cir. 2012); see also Federal Trade Comm'n v. Moses, 913 F.3d 297, 305 (2d Cir. 2019) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary

judgment."); Flores v. United States, 885 F.3d 119, 122 (2d Cir. 2018) ("While we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the non-moving party, . . . conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[.]" (quotations, alterations and citations omitted)).

      B.     Standards for Breach of Contract Claims

Neither party disputes that this case is subject to New York's substantive law of contracts. To prove breach of contract under New York law, a plaintiff must prove "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." Terwilliger v. Terwilliger, 206 F.3d 240, 246–47 (2d Cir. 2000) (citations omitted). "Under applicable New York law, 'a party asserting a breach of contract claim has the burden of proving the material allegations in the complaint by a fair preponderance of the evidence." BartonGrp., Inc. v. NCR Corp., 796 F. Supp. 2d 473, 498 (S.D.N.Y. 2011) aff'd 476 F. App'x 275 (2d Cir. 2012) (quoting Raymond v. Marks, 116 F.3d 466, 466 (2d Cir. 1997). "In New York, a cause of action for breach of contract accrues, and the six-year statute of limitations (CPLR § 213(2)) commences when the contract is breached." Yesa LLC v. RMT Howard Beach Donuts, Inc., 222 F. Supp. 3d 181, 193 (E.D.N.Y. 2016).

When ruling on a motion for summary judgment with respect to a contract claim, the first issue to determine "is whether the contract is unambiguous with respect to the question disputed by the parties." Beach v. HSBC Bank USA, N.A., No. 17CV5153, 2018 WL 3996931, at *6 (S.D.N.Y. Aug. 21, 2018) (applying New York law) (citations omitted). This presents a question of law to be decided by the court. Id. The court is bound to give a practical interpretation to the plain language of a contract, found within its four corners. Id. A court must not find a contract

ambiguous "where the interpretation urged by one party would 'strain [ ] the contract language beyond its reasonable and ordinary meaning." Id.

C.    Standards for Breach of Implied Contractual Duties

Under New York law, the implied covenant of good faith and fair dealing inheres in every contract.  Travellers Int'l A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1575 (2d Cir. 1994). A cause of action alleging breach of the implied covenant of good faith and fair dealing must be dismissed if it is merely duplicative of a breach of contract claim. Refreshment Mgmt Serv., Corp. v. Complete Office Supply Warehouse Corp., 89 A.D.3d 913, 915, 933 N.Y.S.2d 312 (2d Dep't 2011). Nonetheless, where a contract allows the exercise of discretionary acts, those acts must be exercised in good faith. Cross & Cross Properties, Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d Cir. 1989) (applying New York law). "The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract." Id.  Determining intent and expectations can often involve "knotty questions of fact." Id.  The implied covenant "does not 'extend so far as to undermine a party's general right to act on its own interests.'" Vartanian v. Jet Blue Airways Corp., No. 08 Civ. 5101(BMC), 2010 WL 11627482, at *10 (E.D.N.Y. July 30, 2010) (quoting Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 408 (2d Cir. 2006). Indeed, the duty "sets the outer boundaries of the parties' discretionary actions and any within those bounds, which were contemplated from the outset of the agreement, are proper." Id.

<u>DEFENDANTS' MOTION</u>

I.    <u>Rulings Applicable to Several Arizona Plaintiffs' Claims</u>

    A.    <u>Claims That Seek Only Forms of Relief (Claims 16, 17 and 18)</u>

As noted, Plaintiffs' complaint contains eighteen separate causes of action. As discussed during oral argument, the last three (accounting, declaratory judgment, and permanent injunction) do not state separate causes of action, but instead, seek forms of relief that may be afforded if Plaintiffs prevail. They therefore do not properly state separate claims that are they subject to proper adjudication on a motion for summary judgment. The Court will therefore not address them further. It notes only that if Plaintiffs prevail, these forms of relief, if appropriate, may be sought.

    B.    Breach of Contract Claims Based Upon
           Post-Termination Breaches (Claims 4, 5 and 6)

Three of the Arizona Plaintiffs' claims for breach of contract allege a breach that took place after the expiration of the contracts alleged to have been breached.[8]  Thus, the fourth, fifth and sixth claims (and a large amount of the damages alleged herein) rely upon the argument that the terms of certain contracts were extended to be coterminous with the term of the Arizona FA – which extends to November 2020. It is clear that this issue involves a matter of interpretation of unambiguous contractual language that this Court can determine as a matter of law.

Relying upon their theory of "contract extension by integration" the Arizona Plaintiffs seek damages stemming from breaches of the Arizona LFC/FSA and the Arizona OFA that took place in 2016. Specifically, any breach under this theory is stated to have occurred on October

---

[8]    The Water Mill Plaintiffs make no such argument. Their contract with Defendants was actually extended, but ended in 2015.

18, 2016, when Defendants told the Denhams that as of December 1, 2016, they would no longer be receiving orders for fulfillment.

Defendants do not dispute that they stopped sending orders for fulfillment to the Arizona Plaintiffs on December 1, 2016.  DE 94 ¶¶ 34; 94. However, Defendants argue that they could not have breached the Arizona LFC/FSA or the Arizona OFA in 2016 because those agreements had expired in 2014 and 2012 — years before the alleged 2016 breach. For the reasons set forth below, the Court agrees with Defendants and rejects, as a matter of law, the Arizona Plaintiffs' argument of contract extension. In particular, this Court can construe the merger clause in the Arizona FA, and decide the issue of whether it bars Plaintiffs' argument regarding extension of the Arizona LFC/SFA, and the Arizona OFA as a matter of law.

The Arizona FA contains a clear an unambiguous merger clause which states:

> This Agreement, the Manuals, the Exhibits to this Agreement and any documents incorporated by reference, represent the entire understanding between the parties regarding the subject matter of this Agreement and supersede all other negotiations, agreements, representations and covenants, oral or written, except any other agreement executed by FRANCHISOR, or its affiliates, and FRANCHISEE.  This Agreement may not be modified except by a written instrument signed by the party to be charged.  The parties intend this Agreement to be the entire integration of all their agreements of any nature regarding the subject matter of this Agreement.  No other agreements, representations, promises, commitments or the like, of any nature, exist between the parties. By placing his initials at the end of this Paragraph 23(d), FRANCHISEE acknowledges the accuracy of the provisions of this Paragraph 23(d).

Walker Aff. Ex. E ¶ 23(d) (emphases added). The Arizona Plaintiffs argue that both of the expired contracts alleged to have been breached were somehow "incorporated by reference" according to the terms of the merger clause above. They argue that the integration clause incorporates the terms of the parties' other contractual relationships.  The Arizona Plaintiffs cite

to the language in Section 23(d) stating that "[t]he parties intend this Agreement to be the entire integration of all of their agreements of any nature," and argue that the only construction of this sentence is that the Arizona FA supersedes *all* contracts that the parties ever entered into.

The Arizona Plaintiffs' argument fails for two reasons. First, they selectively quote the agreement to further their position.  The full sentence in paragraph 23(d) reads, "[t]he parties intend this Agreement to be the entire integration of all of their agreements of any nature *regarding the subject matter of this Agreement*."  (emphasis added).  As such, section 23(d) does not have the sweeping power to supersede all agreements as Plaintiff suggests, and the Arizona FA is limited to superseding agreements related to the subject matter covered by the Arizona FA.

Second, and perhaps more importantly, Section 23(d) expressly states that it does *not* supersede "any other agreement executed by FRANCHISOR, or its affiliates, and FRANCHISEE." Such "other agreements" include, necessarily, the Arizona LFC/SFA and the Arizona OFA, which are expressly <u>not</u> changed by the merger clause.

The merger clause appearing in Section 23(d) of the Arizona FA is not ambiguous. The only proper reading of that clause is that the Arizona FA represents the entire understanding between the parties "regarding the subject matter of the agreement," and that the Arizona FA does not supersede "any other agreement executed by FRANCHISOR, or its affiliates, and FRANCHISEE." It cannot be relied upon to extend the terms of the parties' other agreements.

In possible recognition of the strained nature of the argument above, Plaintiffs also appear to base their argument for contract extension on an addendum to the Arizona FA that simply refers to the then-existing Arizona LFC/SFA and the Arizona OFA. They seek to turn this reference into an overall extension of both. The mere reference to these contracts, which were

both in existence as of the 2010 Arizona FA, (even if some terms thereof are somehow "incorporated by reference") cannot change their explicit dates of expiration.

If the parties intended to change the expiration dates of the Arizona LFC/SFA and/or the Arizona OFA when they entered into the Arizona FA in 2010, they could have done so at that time — when the Arizona FA was signed. They did not. Instead, they executed only the Arizona FA, a contract containing a merger clause that specifically excludes the Arizona Plaintiffs' current interpretation. Indeed, the clear language of the merger clause contradicts Plaintiffs' argument that the Arizona FA somehow modified the clear terms of the parties' other contracts.

In sum, there is no support for Plaintiffs' strained interpretation of the Arizona FA. The clear merger clause language of that contract specifically excludes the interpretation sought.  The Arizona LFC/SFA expired in 2014.  The Arizona OFA expired in 2012. Because Plaintiffs allege a breach that took place in 2016, Defendants' motion for summary judgment as to Plaintiffs' Fourth, Fifth, and Sixth claims is granted.

C.    Claims Based upon Fruit Bouquet Misrepresentations

The Court has detailed above the parties' positions regarding statements made about the fruit business. The theories of many of Plaintiffs' claims rely on the assertion that Defendants made false representations of fact regarding the Fruit Bouquet Business. These are referred to herein as the Fruit Bouquet Misrepresentations. The Court has detailed the parties' positions as to these representations in the recitation of facts above. In short, Defendants offer testimony supporting the truth of any representations made; Plaintiffs offer the opposite version of the facts.

Upon consideration of the parties' positions, the Court holds that the facts before the Court could permit a trier of fact to infer that the truth or falsity of the Fruit Bouquet

Misrepresentations. In view of that holding, material questions of fact remain both as to representations made, and as to whether the fruit bouquet orders were, indeed incremental. This issue of fact precludes summary judgment as to several claims, as set forth below.

II.     Breach of Contract - Failure to Pay Monies Owed (First Claim)

      In addition to the breach of contract claims alleging post-termination breaches (which have been rejected), both sets of Plaintiffs allege, in their first claim, the breach of contracts that were in effect at the time of the breaches. In particular, they allege that Defendants breached the Arizona LFC/FSA, the Arizona OFA, and the Water Mill OFA by failing to send a percentage of the aggregate orders received from specified zip codes to Plaintiffs. DE 47 at ¶ 49. Plaintiffs contend that Defendants breached sections 6(b) and 6(c) of the OFAs by failing to pay commissions on the gift orders fulfilled. Id. at ¶¶ 50–51. Defendants argue that part of Plaintiffs' claims are barred by the statute of limitations, and that any remaining claims are foreclosed by the parties 'agreements.

      As noted, six-year statute of limitations applies to the breach of contract claims. There is therefore no question therefore, that since their contracts expired in 2012, 2014, and 2015, Plaintiffs' damages claims are limited to those that arose after May 24, 2010, and prior to the expiration of their respective contracts.

      Even as so limited, Defendants attempt to dispose of Plaintiffs' breach of contract claims by reference to the BloomNet Agreements. It is argued that any of Plaintiffs' claims for non-payment are foreclosed by the order reconciliation process set forth in those agreements. The Court disagrees. In their first claim, Plaintiffs are specifically seeking damages based on Defendants' alleged breaches of sections 6(b) and 6(c) of the OFAs, not on the BloomNet Agreements. Defendants fail to show that there is no issue of disputed fact as to whether any

damages that Plaintiffs seek under the OFAs are the same damages as those that Defendant alleges result from Plaintiffs' failure to adhere to its obligations under the BloomNet Agreements. Put another way, Defendants have not demonstrated that Plaintiffs' alleged breaches of contract are foreclosed by the BloomNet Agreements.

Defendants' motion for summary judgment as to Plaintiffs' First Claim is denied.

III.    Breach of the Covenant of Good Faith and Fair Dealing (Second Claim)

Plaintiffs claim that Defendants violated the covenant of good faith and fair dealing by engaging in business practices, and exercising their discretion under the parties' contracts in a manner that denied Plaintiffs the benefits of the specific contracts, and the business relationship generally.  DE 47 ¶ 59.

Specifically, Plaintiffs contend that Defendants breached their implied duties in nine separate ways as follows: (1) imposition of unreasonable reconciliation deadlines; (2) failure to renew the Order Fulfillment Agreement; (3) imposition of new fees; (4) imposition of BloomNet membership fee increases; (5) improper use of auto-shipment; (6) preventing shop to shop orders; (7) requiring plaintiffs to fill orders at a loss; (8) requiring participation in Fruit Bouquets; and (9) improper competition.  Defendants argue that they are entitled to summary judgment as to all of these claims because each is duplicative of Plaintiffs' breach of contract claims.

First, Defendants seeks summary judgment as to several claims on the ground that they are within Defendants' contractual rights as set forth in the BloomNet Agreements. As set forth below, the Court agrees as to certain terms, but disagrees as to others.

A.    <u>Claims Based Upon Reconciliation Deadlines (Breach 1)</u>

The express terms of the BloomNet Agreements impact Plaintiffs' breach of the implied duty claims regarding reconciliation deadlines. In particular, subsections (1) and (5) to the paragraph entitled "Clearing House Statement" in the Plaintiffs' BloomNet Agreements state:

> (1) BloomNet guarantees payment of all successfully delivered floral wire orders if they are reported within ninety (90) days of any BloomNet Florist listed in the current BN Directory from the time the order was delivered . . . .
>
> (5)  Disputes and requests for credits on an order received from 1800flowers.com must be submitted to floristatementinquiries@1800flowers.com on an order received from another BloomNet Florist disputes must be submitted to customerservice@BloomNet.net within (30) days of receipt of the statement in question.

DE 107-1; 2.

In support of one of the nine branches of their implied duty claim, Plaintiffs argue that Defendants "unilaterally implemented and imposed upon Plaintiffs an arbitrary ninety-day rule regarding notification of billing errors."  Plaintiffs' argument fails because the 90-day rule and process for order reconciliation was governed by the express terms of BloomNet Agreements. As such, Plaintiffs expressly agreed to the 90-day "guaranteed" period and cannot now contend that this reconciliation "deadline" is unreasonable.  Plaintiffs fail to directly address the BloomNet Agreements, and instead argue that the BloomNet Agreements did not modify the Arizona LFC/SFA and the Arizona OFA. But Defendants do not argue in favor of any such modification. Both parties recognize that numerous agreements governed the parties' relationships, and Plaintiff fails to show why the BloomNet Agreement could not govern the parties' relationship in addition to the OFA's.

Plaintiffs devote much of their argument to explaining how the reconciliation process (as outlined in the Court's assessment of Plaintiffs' first claim) was difficult and time-intensive. The fact that a clear contractual term may impose a difficult obligation on a party does not mean that that term is unenforceable. Further, Plaintiffs' argument that Defendants "imposition of a short reconciliation period was not a reasonable exercise of discretion" also ignores the plain language of the BloomNet Agreements. Defendants did not exercise any discretion in determining the length of the reconciliation period. Instead, the BloomNet Agreements expressly provided for a clear 90-day reconciliation period, and a time in which to object to any charges. Plaintiffs' breach of implied duty claim premised on an allegation of "unreasonable reconciliation deadlines" is thus foreclosed by the terms of the contract.

Defendants' motion for summary judgment as to the first alleged breach of the covenant of good faith and fair dealing is granted.

B.    Claims Based Upon Imposition of Fees (Breaches 3 and 4)

Defendants argue that the BloomNet Agreements foreclose any implied duty argument based upon the imposition of fees. Plaintiffs argue that Defendants unreasonably exercised their discretion in implementing new fees and increasing fees. Defendants again contend that they were permitted to exercise such discretion according to the express terms of the parties' agreements, and cite to a provision of the BloomNet Agreements. The BloomNet Agreements provide:

> Bloomnet reserves the right to amend or change the rules, rates, fees, commissions and charges now existing at any time or as in effect from time to time. Changes will be published in the Directory, mailed or sent through BloomLink to members. Amendments or changes shall be effective on the first day of the month following publication or mailing unless otherwise indicated.

DE 107-1; 2.

In response, Plaintiffs argue that even if the BloomNet Agreements gave Defendants discretion to make fee changes, any such discretionary contractual right may not be exercised in bad faith.  See Cross & Cross Properties, Ltd. v. Everett Allied Co., 886 F.2d 497, 502 (2d Cir. 1989) ("Since the duty of good faith and fair dealing is implied in every contract, contracting parties' fields of discretion under a contract are bounded by the parties' mutual obligation to act in good faith."); Richbell Info. Servs. v. Jupiter Partners, 309 A.D.2d 288, 302, 765 N.Y.S.2d 575 (1st Dep't 2003) ("even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement.").

Relying on the law set forth above, Plaintiffs argue that the record raises genuine factual issues as to whether the Corporate Defendants dealt with the Plaintiffs in good faith in exercising discretionary contract rights to implement new fees and raise the costs of existing fees.  The Court agrees.  Even if the relevant agreements gave Defendants discretion over fee increases, Defendants were required to exercise that discretion in good faith.  There are disputed issues of material fact as to whether Defendants exercised their discretion in good faith.

Defendants' motion for summary judgment as to the third and fourth breaches of the covenant of good faith and fair dealing regarding fee increases is denied.

C.    Claim Based Upon Improper use of Auto-Shipment (Breach 5)

Defendants contend that the use of "auto-shipment" is expressly provided for in the BloomNet Agreements, and that therefore no claim for breach of an implied duty is stated.  With respect to auto-shipment, the BloomNet Agreements provide:

> BloomNet Preferred Florists must meet and maintain . . . the additional standards below to be preferred members . . . . .
> (3) Maintain an adequate inventory of fresh flowers, greens, plants, hard goods, and other necessary items to fill any 1-800-FLOWERS.COM order or the order of any other BloomNet Florist.

DE 107-1; 2.

The BloomNet Agreements also provide that BloomNet members authorize BloomNet, 1-800-Flowers, and/or its affiliates to "deduct and retain from an[y] fees or commissions due BloomNet Member, any charges, interest or penalties due . . ." Id.  Defendants contend that these provisions grant them the ability to provide Plaintiffs with an inventory of hard goods. The cited agreement states that Plaintiffs agreed to "[m]aintain an adequate inventory of fresh flowers, greens, plants, hard goods and other necessary items to fill any 1-800-Flowers.com order or the order of any other BloomNet Florist" and that Defendants authorize deductions to pay for the goods.  Plaintiffs are correct that Defendants were required to exercise their discretion concerning their "auto-shipment" rights in good faith.  There are disputed issues of material fact as to whether Defendants did so.

Defendants' motion for summary judgment as to the fifth alleged breach of the covenant of good faith and fair dealing is denied.

D.    Claim Based Upon Participation in the Fruit Bouquet Program (Breach 8)

Plaintiffs argue that the "Defendants pressured, coerced and made misrepresentations to them in order to induce them to sell Fruit Bouquets."  Defendants do not dispute that Plaintiffs took part in the Fruit Bouquet program, but explain that while the Water Mill Plaintiffs did participate in the Fruit Bouquet program, the Arizona Plaintiffs refused to sign any agreements related to that business.

Defendants contend that this claim should be dismissed as to the Water Mill Plaintiffs because there are no questions of fact related to whether Defendants made misrepresentations that the Fruit Bouquet business would be incremental.  The Court holds that questions of fact regarding the alleged Fruit Bouquet Misrepresentations preclude a grant of summary judgment.

Therefore, as to the Water Mill Plaintiffs, the Court denies Defendants' motion for summary judgment as to the eighth breach of the implied covenant of good faith and fair dealing.

Since there was no contract involving the Arizona Plaintiffs' participation in the Fruit Bouquet program, any such claim will be limited to the Arizona Plaintiffs' ability to show breach of an implied contract. Defendants' motion for summary judgment dismissing the Arizona Plaintiffs' eighth breach of the implied covenant of good faith and fair dealing as to the Arizona Plaintiffs is also denied.

Defendants' motion for summary judgment as to the eighth alleged breach of the covenant of good faith and fair dealing is denied.

      E.     <u>Motion as to Claims Based Upon Breaches 2, 6, 7, and 9</u>.

Defendants' motion for summary judgment dismissing the four breaches not discussed above is based upon the argument that Plaintiffs fail to properly allege damages as to these particular breaches. Plaintiffs argue that their failure to offer a damages computation is not a proper ground upon which to award summary judgment, or upon which it can be assumed that a party has not suffered damages. They also argue that damages not addressed by Plaintiffs' expert will be addressed at trial by the Plaintiffs. DE 86. n.37.

Plaintiffs are correct that they are not required to specifically provide expert testimony for their damages. See <u>Fabozzi v. Lexington Ins. Co.</u>, 23 F. Supp. 3d 120, 130 (E.D.N.Y. 2014) (refusing to require expert testimony as to damage "as a matter of law"). Defendants argue, without authority, that expert testimony is required to prove damages in this instance. The damages argument is Defendants' only argument with respect to their motion for summary judgment as to breaches numbered two, six, seven and nine. That argument cannot, alone, carry the day.

Defendants' motion for summary judgment as to the second, sixth, seventh, and ninth breaches of the covenant of good faith and faith dealing is denied.

IV.   <u>Common Law Unfair Competition (Third Claim)</u>

Plaintiffs assert a claim for common law unfair competition, alleging that the Corporate Defendants engaged in certain business practices designed to redirect potential customers from Plaintiffs' local markets to Defendants.  DE 47 ¶¶ 97–103.

In New York, unfair competition "is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." <u>Bubble Genius LLC v. Smith</u>, 239 F. Supp. 3d 586, 601–02 (E.D.N.Y. 2017) (citing <u>Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.</u>, 58 F.3d 27, 43 (2d Cir. 1995)). "[A] plaintiff asserting an unfair competition claim under New York common law must also show that the defendant acted in bad faith." <u>Luv n' Care v. Mayborn USA, Inc.</u>, 898 F. Supp. 2d 634, 643 (S.D.N.Y. 2012).  However, "[n]ot every act, even if taken in bad faith, constitutes unfair competition." <u>Commercial Assoc., Inc. v. Simple.com, Inc.</u>, 621 F. Supp. 2d 45, 53 (E.D.N.Y. 2009).

Defendants cite to the deposition of Marlowe to support their argument that "there is no evidence in the record that 1-800-Flowers did or intended to confuse customers as alleged by plaintiff." Plaintiffs do not dispute Marlowe's testimony showing that he was not "aware" of the alleged conduct redirecting Plaintiffs' customers to their portals.

Plaintiffs' claim must be dismissed because the undisputed facts, taken in the light most favorable to Plaintiffs, fail to demonstrate any bad faith by Defendants. In their papers and at oral argument Plaintiffs made clear that they rely on a copy of a webpage that they say improperly redirected a consumer online search. Other than a passing reference to "other franchisee

complaints," Plaintiffs submitted no real evidence that the alleged re-directing took place on any regular basis. Plaintiffs also submitted no real evidence that the alleged re-directing took place in bad faith. As such, Plaintiffs are unable to assert an unfair competition claim under New York common law. Luv n' Care, Ltd., 898 F. Supp. 2d at 643. Indeed, Plaintiffs fail to even address the "bad faith" element other than the making a conclusory statement that the question of bad faith would be one for the jury. While the issue of whether Defendants acted in bad faith may be a question of fact, the undisputed facts here fail to support even a plausible inference that Defendants acted in bad faith where, as demonstrated by Marlowe's testimony, Defendants were not even aware of the "redirecting" conduct.

Defendants' motion for summary judgment as to Plaintiffs' Third Claim is granted.

V.     Arizona's Consumer Fraud Act (Tenth Claim)

The basis of the Arizona Plaintiffs' claim pursuant to the Arizona Consumer Fraud Act (the "Arizona Act") is the alleged Fruit Bouquets Misrepresentations. Defendants seek summary judgment on the grounds that they made no false representations, and that any such claim is time barred by the Arizona Act's one-year statute of limitations.

The motion on the merits of this claim must be denied because a question of fact remains as to the Fruit Bouquet Representations. Accordingly, the Court rejects Defendants 'argument that these claims should be dismissed on the merits and turns to consider Defendants 'argument that the claim is time barred.

The parties agree that the Arizona Act has a one-year statute of limitations. Ariz. Rev. Stat § 12-541(5). Additionally, there is no dispute that the statute runs from discovery of the alleged misrepresentation. See Cheatham v. ADT Corp., 161 F. Supp. 3d 815 (D. Ariz. 2016) ("The limitations periods [of a private action under the ACFA] begins to run when the consumer

discovers or with reasonable diligence should have discovered both the 'who' and the 'what' of her claim.").

Defendants argue that the statutory period began to run on the date that Plaintiffs agreed to participate in the Fruit Bouquet Program (in October 2014) which would mean that Plaintiffs only had only until October 2015 to bring a claim. These dates would make any claim raised in this 2016 lawsuit untimely. Defendants specifically cite to the fact that Mr. Denham refused to sign agreements related to fruit bouquets because they did not include a mechanism allowing him to separately track floral and fruit bouquet orders so he could confirm that they were incremental. Defendants characterize Mr. Denham's request as him "form[ing] his belief that they were not incremental." Plaintiffs argue, on the other hand, that they could not have known that their Fruit Bouquets orders were not incremental until a sufficient period of time had passed for them to make a comparison to the prior year's orders — in or around June of 2015.

When discovery occurs and a cause of action accrues under the Arizona Act are usually and necessarily questions of fact for the jury. Delgado v. Ocwen Loan Serv., LLC., No. 13-CV-4227(NGG)(ST), 2017 WL 5201079, at *11 (E.D.N.Y. Nov. 9, 2017) (applying the Arizona Consumer Fraud Act). The Court is not persuaded by Defendants' argument that the limitations period began to run as soon as the Arizona Plaintiffs began asking Defendants questions about incrementality.

The presence of material questions of fact regarding the Fruit Bouquet Misrepresentations, and when any claim could have been discovered preclude a grant of summary judgment.

Defendants' motion for summary judgment as to the Arizona Plaintiffs' Tenth Claim is denied.

VI.    <u>Florida's Deceptive and Unfair Trade Practices Act (Eleventh Claim)</u>

Plaintiffs allege that the Fruit Bouquets Misrepresentations and seven specific business practices were deceptive acts and/or unfair practices likely to injure reasonably relying consumers under the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA" or the "Florida Act").  "A claim under FDUPTA has three elements: (1) a deceptive or unfair practice; (2) causation; and (3) actual damages."  <u>Siever v. BWGaskets, Inc.</u>, 669 F. Supp. 2d 1286, 1292 (M.D. Fla. 2013). "Whether particular conduct constitutes such an unfair or deceptive trade practice is a question of fact."  <u>Id.</u> at 1293. "A practice will be deemed 'unfair' when it 'offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, (or competitors or other businessmen)'."  <u>Hanson Hams, Inc. v. HBH Franchise Co., LLC</u>, No. 03-61198-CIV, 2003 WL 22768687, at *2 (S.D. Fla. Nov. 7, 2003) (citing <u>Day v. Le-Jo Enters., Inc.</u>, 521 So.2d 175, 178 (Fla. Dist. Ct. App. 1988)).  "[A] claim under FDUPTA is not defined by the express terms of a contract, but instead encompasses unfair and deceptive practices arising out of business relationships."  <u>Siever</u>, at 1293; <u>see</u> <u>Rebman v. Follett Higher Educ. Grp., Inc.</u>, 575 F. Supp. 2d 1272, 1279 (M.D. Fla. 2008). However, where a FDUPTA claim is based upon a clear provision of the parties' contractual relationship, and seeks to state a claim clearly contradictory to that relationship, no claim under the Florida Act is stated. <u>See</u> <u>TRG Night Hawk Ltd. v. Registry Dev. Corp.</u>, 17 So.3d 782, 784–85 (Fla. Dist. Ct. App. 2009) (where contract stated that no particular representation was made regarding government approvals, plaintiff could not pursue a FDUPTA claim based upon alleged misrepresentations regarding such approvals); <u>Rosa v. Amoco Oil Co.</u>, 262 F. Supp.2d 1364, 1368 (S.D. Fla. 2003) (where contractual terms contradict alleged misrepresentations plaintiff may not pursue FDUPTA claim based upon same agreed upon terms). Finally, "FDUPTA

applies only to actions that occurred within the state of Florida." <u>Five for Entm't S.A. v. Rodriguez</u>, 877 F. Supp. 2d 1321, 1330 (S.D. Fla. 2012); <u>Carnival Corp. v. Rolls Royce PLC</u>, No. 08-23318-CIV, 2009 WL 3861450, at *6 (S.D. Fla. Nov. 17, 2009) ("Plaintiffs' claim that Defendants violated FDUPTA must be based entirely on actions that occurred within Florida."); <u>see also</u> <u>Millennium Commc'n & Fulfillment, Inc. v. Office of the Attorney General</u>, 761 So.2d 1256, 1262 (Fla. 3d DCA 2000) (stating that the purpose of FDUPTA is to prohibit unfair and deceptive practices which have transpired within the territorial boundaries of the state of Florida).

In addition to alleging that the Fruit Bouquet Misrepresentations constitute actionable conduct within the meaning of the Florida Act, the Water Mill Plaintiffs allege that the statute was violated by a laundry list of practices, including essentially every aspect of the parties' business relationship. Those practices include the 90-day reconciliation rule, the refusal to extend OFAs, the imposition of new fees and surcharges, auto-shipping unwanted products, improperly collecting certain franchise fees and royalties, restricting or suspending shop-to-shop orders received through BloomNet and/or directing orders away from plaintiffs to other BloomNet members, requiring plaintiffs to fulfill unprofitable produce recipes, competing against the plaintiffs, engaging in direct marketing to customers in the plaintiffs' territories, and usurping plaintiffs' local business opportunities. DE 47 ¶ 174.

Defendants argue that each of the "unfair" practices were actually contracted for between the parties, and that Plaintiffs' claims are barred by the statute of limitations. In response, it is argued that the Water Mill Plaintiffs may pursue a separate FDUPTA claim related to Defendant's alleged breaches of the covenant of good faith and fair dealing (Plaintiffs' second

claim) so long as the act giving rise to the breach also constitutes an alleged unfair or deceptive trade practice, and that the claims are not time-barred.

The Court will first address the statute of limitations argument.  The parties agree that a four-year statute of limitations applies to a private claim under the FDUPTA.  Fla. Stat. § 95.11(3)(f); Brexendorf v. Bank of Am., N.A., 319 F. Supp. 3d 1257, 1263 (M.D. Fla. 2018). Defendants only cursorily address one of the eight alleged breaches and argue that the limitations period on Plaintiffs' FDUPTA claim started running in January, 2011, when the Water Mill Plaintiffs purchased the Fruit Bouquet Starter Kit.  Defendants are incorrect.  The limitations period begins to run when the last element of the FDUPTA claim occurs, meaning when the Water Mill Plaintiffs suffered damages.  Brexendorf, 319 F. Supp. 2d at 1263 ("the limitations period [on an FDUPTA claim] begins to run when the last element of the claim occurred . . . The last element of the FDUPTA Claim is actual damages.").  Defendants failed to present facts that would indicate that the statute of limitations for each of the seven alleged unfair practices accrued after the limitations period expired. Accordingly, the Court denies the motion to for summary judgment on the FDUPTA claims to the extent it is based on the statute of limitations.

Turning to the merits of the FDUPTA motion, the Court must reject the general argument that all of the Water Mill Plaintiffs' FDUPTA claims are subject to summary dismissal because each of the "unfair" practices were actually contracted for between the parties. Some claims are; others are not.

Applying the legal principles set forth above, the Court holds that the Water Mill Plaintiffs may not pursue separate FDUPTA claims to the extent that they contradict clear and express terms of the parties' agreements. Thus, Defendants are entitled to summary judgment as to claims based upon the time frames set forth in the reconciliation process. Summary judgment

to Defendants is also granted with respect to any claim alleging that it was an unfair practice for Defendants to fail to renew or extend any of the Water Mill contracts.  It certainly cannot constitute an unfair business practice to refuse to continue to do business with a former business associate where the contract among the parties does not provide for renewal or extension. See Silver v. Countrywide Home Loans, Inc., 483 F. App'x 568, 571 (11th Cir. 2012) (rejecting FDUPTA claim that mortgage company refused to refinance mortgage where that company had discretion to decide whether to refinance).

The same legal principles that require dismissal of certain of the Water Mill Plaintiffs FDUPTA claims also require that some survive summary judgment. In particular, they may pursue those claims based upon contractual terms that were allegedly exercised in bad faith. Such claims include those asserting that Defendants imposed fees and surcharges in bad faith. The Water Mill Plaintiffs may also pursue claims based upon the Fruit Bouquet Misrepresentations.

The Court stresses that while not all claims are dismissed on summary judgment, the Water Mill Plaintiffs will bear the burden of proving, at trial, each of their long and varied list of allegedly deceptive acts, and that each was timely asserted. The Court notes also that certain misrepresentations took place in Las Vegas and that, in addition to showing timely deceptive conduct, the Water Mill Plaintiffs will have to prove that the conduct giving rise to their FDUPTA claims took place within the State of Florida.

Defendants' motion for summary judgment as to the Eleventh Claim is granted in part and denied in part.

VII.    <u>Common Law Fraud (Twelfth Claim)</u>

All Plaintiffs allege a claim for common law fraud based on the Fruit Bouquet Misrepresentations.  DE 47 ¶ 180–85.  "To prove common law fraud under New York law a plaintiff must show that (1) the defendant made a material false statement or omission; (2) the defendant intended to defraud the plaintiffs; (3) the plaintiff reasonably relied upon the representation or omission; and (4) the plaintiff suffered damage as a result of such reliance." <u>PPI Enters. (U.S.), Inc. v. Del Monte Foods Co.</u>, No. 99 Civ. 3794(BSJ), 2003 WL 22118977, at *19 (S.D.N.Y. Sept. 11, 2003) (citing <u>Banque Arabe de Internationale D'Investissement v. Maryland Nat'l Bank</u>, 57 F.3d 146, 153 (2d Cir. 1995)).  Under New York law, a plaintiff must prove each element of a fraud claim by clear and convincing evidence.  <u>Computerized Radiological Servs. v. Syntex Corp.</u>, 786 F.2d 72, 76 (2d Cir. 1996) (citing <u>Accusystems, Inc. v. Honeywell Info. Sys. Inc.</u>, 580 F. Supp. 474, 482 (S.D.N.Y. 1984)).

Defendants allege that portions of Plaintiffs' fraud claim are barred by the statute of limitations.  Section 213(8) of the New York CPLR provides that "the time within which the action [based upon fraud] must be commenced shall be the greater of the six years from the date of the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it."

In support of their argument that the common law fraud claim is time barred, Defendants cite Plaintiffs' expert report to argue that the alleged fraud occurred in 2004. This reference appears at page 21 of the report where it is stated that in 2004, Plaintiffs incurred expenses for the installation of "Fresh Connect," software alleged to have been required by Defendants. Expert Report of Gary B. Rosen at 21. When asked at oral argument about "Fresh Connect," no counsel appearing before the Court had any idea what "Fresh Connect" was. It thus appears that

Fresh Connect is a term known to Plaintiffs' experts, but, curiously, to no one else in this litigation. While this certainly casts a pall on that report, it is not dispositive of the statute of limitations argument. Plaintiffs make clear that the only basis for their common law fraud claim is the representation as to the incremental nature of the fruit business, i.e., the Fruit Bouquet Misrepresentations. As these representations were not made until 2011, the statute of limitations does not bar the fraud claim.

Defendants also argue that Plaintiffs' fraud claim fails because it is not distinct from their breach of contract claim. Defendants cite to Maxim Grp. LLC v. Life Partners Holdings, Inc., 690 F. Supp. 2d 293, 306–07 (S.D.N.Y. 2010) for the proposition that, to distinguish a fraud claim from a breach of contract claim a plaintiffs must either "'(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages'" (citing Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996)). Defendants do not expand on this argument, and the Court assumes that Defendants are arguing that the fraud claim is duplicative of the implied duty of good faith claims, which allege that Defendants pressured and coerced Plaintiffs to sign agreements and participate in the Fruit Bouquet program. Plaintiffs allege that they met the first element of the fraud claim by alleging the Fruit Bouquet Misrepresentations. This Court has already determined that there is a question of fact as to those statements.

Plaintiffs allege that they meet the second element of their fraud claim because Defendants did not have a "functionality" to ensure that the Fruit Bouquet orders would be incremental in 2011, the time when Plaintiffs began fulfilling fruit bouquet orders and when the

Corporate Defendants allegedly represented that the orders would be incremental. While Defendants point to Mr. Escobar's testimony to support their argument that a functionality for ensuring that the orders were incremental were put in place, Plaintiffs have pointed to circumstantial evidence sufficient to sustain their fraud claim.  See Enzo Biochem, Inc. v. Johnson & Johnson, No. 87 Civ. 6125, 1992 WL 309613 (S.D.N.Y. Oct. 15, 1992) (denying summary judgment on fraud claim finding that "plaintiff has provided sufficient evidence for a rational trier of fact to infer fraudulent intent on the part of defendants, both in inducing plaintiff to enter the contract and in inducing the plaintiff to continue satisfying its obligations . . . .").

Plaintiffs have provided sufficient facts from which a jury could infer that Defendants intentionally misrepresented that Fruit Bouquet orders would be incremental to floral orders, because the Defendants did not have functionality in place to ensure that the Fruit Bouquet orders would be incremental at the time Plaintiffs started operating the Fruit Bouquet line of business.  Bradbury v. PTN Pub. Co., Inc., No. 93-CV-5521(FB), 1998 WL 386485, at *7 (E.D.N.Y. July 8, 1998) ("[I]t is well established under both New York and federal law that fraudulent intent is rarely capable of direct proof and must ordinarily be established through the introduction of circumstantial evidence and legitimate inferences arising from that evidence.").

Plaintiffs argue that the facts show that they relied on the Fruit Bouquet Misrepresentations. Defendants argue that Mr. Denham refused to sign the Fruit Bouquet Franchise agreement and Fruit Bouquet Order Fulfillment agreement because the Defendants would not agree to his requested changes. Mr. Denham testified that he did not sign the Fruit Bouquet agreements because Defendants did not provide a tracking mechanism to show whether

the Fruit Bouquet business was incremental to the floral business.[9] Mr. Denham's request for a tracking mechanism does not equivocally refute Plaintiffs' contention that the Arizona Plaintiffs relied on Defendants' promise that the orders would be incremental.

Defendants' reference to Mr. Denham's deposition testimony shows that there is a question of fact as to whether Plaintiffs relied on Defendants' representations. Defendants fail to directly address the reliance factor as to the remaining Plaintiffs, instead apparently relying on their argument that the orders were in fact incremental. Plaintiffs have presented evidence from which a rational trier of fact could infer that Defendants made the Fruit Bouquet Misrepresentations, and that Plaintiffs relied on those statements by subsequently participating in the Fruit Bouquet program.  Bradbury, 1998 WL 386485, at *7 (finding that questions of fact existed as to whether plaintiff relied on defendant's statements). Plaintiffs have also submitted evidence of damages resulting from Defendants' alleged fraud through their expert report. It will be for a jury to determine the weight to give to that report.

Defendants' motion for summary judgment as to the Twelfth Claim is denied.

VIII.    Common Law Negligent Representation (Thirteenth Claim)

Plaintiffs bring a claim for common law misrepresentation against Defendants for making the Fruit Bouquet Misrepresentations. DE 47 ¶¶ 186–193. To sustain a claim for negligent misrepresentation a plaintiff must demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.  J.A.O. Acquisition Corp. v. Stavitsky, 8 N.Y.3d 144, 148, 863 N.E.2d 585, 587 (2007). In support of

---

[9] Mr. Denham testified that "I did request that so I could, in fact, track whether the Fruit Bouquet was incremental to Flowers" and "[w]e wanted a tracking mechanism to know if it was incremental."

their motion for summary judgment on this claim, Defendants argue it is barred by the statute of limitations, and that Defendants did not provide Plaintiffs with mis-information because the Fruit Bouquet orders were incremental.

The Court has already determined that there remains a question of fact as to the Fruit Bouquet Misrepresentations. Accordingly, Defendants' only remaining argument on this claim is that the claim is barred by a three-year statute of limitations. Def. Mot. at 46–47. Defendants' argument fails because the negligent misrepresentation claim that is based on fraud is governed by a six-year statute of limitations. Calcutti v. SBU, Inc., 224 F. Supp. 2d 691, 701 (S.D.N.Y 2002) ("In New York, a negligent misrepresentation claim that is based on the same factual situation as a fraud claim is governed by a six-year statute of limitations."); Lee v. Kim, No. 93 CIV 8280 (KTD), 1994 WL 586436, at *7 (S.D.N.Y. Oct. 25, 1994). Here, Plaintiffs' claim is based on the Fruit Bouquet Misrepresentations, which Plaintiffs allege took place in 2011. DE 47 ¶ 37–47. Plaintiffs filed a Complaint in this action in May 2016. Their negligent misrepresentation claim is timely.[10]

Defendants motion for summary judgment as to the Thirteenth Claim is denied.

IX.   Common Law Fraudulent Inducement (Fourteenth Claim)

In their fourteenth claim, Plaintiffs argue that Defendants omitted telling the Arizona Plaintiffs that they planned to stop sending orders for fulfillment before the end of the Arizona FA.

---

[10] Defendants argue, with no citation to case law, that the negligent misrepresentation claim cannot survive because it is a "redundant fraud claim." While Defendants' argument is unclear and unsupported, the Court notes that Plaintiffs pled a separate claim for negligent misrepresentation, and that claim is independent of Plaintiffs' common law fraud claim.

To sustain a claim for fraudulent inducement under New York law a plaintiff must allege "(1) a knowingly false representation of a material fact and (2) detrimental reliance thereon. The false representation can either be a misrepresentation or the material omission of a fact." Robinson v. Deutsche Bank Tr. Co. Am., 572 F. Supp. 2d 319, 322 (S.D.N.Y. 2008) (citations omitted). A plaintiff "must allege facts that give rise to a strong inference of fraudulent intent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006) (quoting Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995)).

The "omission" that Plaintiffs point to is based on their argument that the Arizona LFC/SFA and OFA were incorporated into the Arizona FA and extended to 2020. Defendants are correct that Plaintiffs' fraudulent inducement claim is duplicative of their sixth claim for breach of contract. Plaintiffs' sixth claim for breach of contract alleges that Defendants improperly stopped sending the Arizona Plaintiffs orders for fulfillment in December 2016.[11] Under New York law, parallel fraud and contract claims may be brought if the plaintiff "(1) demonstrates a legal duty separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seeks special damages that are unrecoverable as contract damages." Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171 (2d Cir. 2007). Plaintiffs argue that they can satisfy the first and second Merrill Lynch elements. The Court disagrees.

---

[11] Plaintiffs' sixth claim for breach of contract is labeled "Breach of Contract – Arizona FA." DE 47 at 26. However, Plaintiffs' specific allegation of breach in the sixth claim only cites to the Arizona LFC/SFA and OFA: "The Corporate Defendants materially breached the Arizona LFC/SFA and Arizona OFA by unilaterally deciding to stop sending the Arizona Plaintiffs 1-800-Flowers orders for fulfillment as of December 1, 2016." DE 47 ¶ 125. This claim is based on Plaintiffs' "extension by incorporation" argument, which the Court has rejected as a matter of law.

1. First *Merrill Lynch* Element

Under New York law, "a duty to disclose material facts arises (1) where there is a fiduciary relationship between the parties, or (2) where one party possesses superior knowledge not readily available to the other, and knows that the other party is acting on the basis of mistaken knowledge." Cong. Fin. Corp. v. John Morrell & Co., 790 F. Supp. 459, 472–73 (S.D.N.Y. 1992). Plaintiffs contend that Defendants had a separate legal duty to Defendants under the latter option, which is sometimes called the "special facts" doctrine.[12] "Three specific elements must be shown to invoke the special facts doctrine: (1) one party must have superior knowledge, (2) that knowledge must not be readily available to the other party, and (3) the party with the knowledge must know that the other party is acting on the basis of mistaken knowledge." Id. at 473. Failure of any single element bars application of the doctrine.

Plaintiffs cannot establish any of the elements, and in fact do not even attempt to do so, simply stating "satisfaction of the three elements . . . are readily apparent." In any event, and as discussed in reference to the second Merrill Lynch element below, Defendants did not have superior knowledge related to the termination of the Arizona LFC/SFA and the Arizona OFA. Both parties had access to the terms of the agreements which stated that they terminated in 2012 and 2014. For the same reason, Plaintiffs cannot establish the second element of the special facts doctrine. Finally, Plaintiffs failed to plead or offer any evidence on which a reasonable fact-

---

[12] Plaintiffs make a passing statement that there was a fiduciary relationship between the Arizona Plaintiffs and the Defendants "as it related to the Arizona Plaintiffs' funds over which the Corporate Defendants had control (as discussed *infra*, concerning several claims)," but do not otherwise develop its "fiduciary relationship" argument. Indeed, Plaintiffs specifically state that they "rely on the second theory, often termed the 'special facts' doctrine." Pl. Opp. at 143. The Court notes that Plaintiffs have not established a "fiduciary" relationship in reference to any other of the eighteen claims and eighteen counterclaims at issue.

finder could decide that Defendants knew that the Arizona Plaintiffs were acting on the basis of mistaken knowledge. Plaintiffs' perfunctory invocation of the special facts doctrine fails.

2.    Second *Merrill Lynch* Element

A plaintiff may bring parallel fraud and breach of contract claims if the plaintiff "points to a fraudulent misrepresentation that is collateral or extraneous to the contract."  Merrill Lynch, at 183.  As stated in footnote 11 above, Plaintiffs' sixth claim for breach of contract alleges that Defendants breached the Arizona FA and was premised on Plaintiffs' argument that the Arizona LFC/SFA and OFA were incorporated into the Arizona FA and extended to 2020.  New York courts distinguish between a "promissory statement as to what will be done in the future," which gives rise only to a breach of contract claim, and a false "representation of present fact," which may also give rise to a separable claim of fraudulent inducement.  Stewart v. Jackson & Nash, 976 F.2d 86, 89 (2d Cir. 1992).  Here, the alleged misstatements were regarding prospective performance rather than present facts and are thus insufficient to support a separate fraud claim. In opposition to Defendants' motion for summary judgment Plaintiffs offer only the conclusory statement that "it was a material omission of fact for the Corporate Defendants not to disclose that *they then viewed* the Arizona LFC/SFA and the Arizona OFA as terminating before the end of that term year in 2020."  DE 86 at 131 (emphasis added).  But, in 2010 (when the Arizona Plaintiffs signed the Arizona FA) the time that the Arizona LFC/SFA and the Arizona OFA would terminate was not a subjective "viewpoint" of the Defendants, but instead was a fact governed by the express terms of the agreements.  Accordingly, Plaintiffs must be alleging that Defendants were omitting information related to their prospective actions — i.e., what Defendants would do when the contracts terminated in the future (2012 and 2014), which is duplicative of their sixth claim for breach of contract.  As such, Plaintiff cannot carry its burden

to show that Defendant breached a duty collateral to the contract.  See Merrill Lynch & Co., 500 F.3d at 184.

Defendants' motion for summary judgment dismissing Plaintiffs' Fourteenth Claim is granted.

X.    Conversion (Fifteenth Claim)

Plaintiffs argue that Defendants wrongfully demanded, took and/or withheld area development fees and franchise fees from the Arizona Plaintiffs and Water Mill Plaintiffs.  DE 47  ¶ 204–212.  However, only the Water Mill Plaintiffs continue to pursue the conversion claim to recover "Design Center Royalties." In particular, Water Mill Plaintiff Dowd states that after the closing of a satellite store in 2011, Defendants continued to improperly collect royalties from the Fort Lauderdale Center, even though that business was not a franchise store. This alleged conversion of funds is stated to have continued until 2015. Dowd. Decl. ¶12.

"Conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 403 (2d Cir. 2006) (citing Vigilant Ins. Co. of Am. v. Hous. Auth., 87 N.Y.2d 36, 44, 637 N.Y.S.2d 343, 660 N.E.2d 1121 (1995)).  "To state a claim of conversion the plaintiff must allege that "(1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another[,] (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused." Lefkowitz v. Bank of New York, 676 F. Supp. 2d 229, 251 (S.D.N.Y. 2009) (citations omitted).

Defendants argue that the "Design Center Addendum to the Area Development Agreement" specifically provides for the Water Mill Plaintiffs to pay franchise fees on the Design Center.  Plaintiffs argue that the Addendum specifically did not incorporate the portion of

the Franchise Agreement that required payment of fees, and that, in any event, payment of any fees would end when the Water Mill FA closed in 2011. In response, Defendants cite a portion of the Addendum that specifically states that the Water Mill Plaintiffs would continue to pay "franchise fees and marketing fees on all sales from the Design Center Facility and on all services provided from the Design Center Facility, in addition to all other applicable charges assessed by Franchisor, or its affiliates, as required by the Franchise Agreements."

While it is clear from the agreements that the Water Mill Plaintiffs were required to pay fees to Defendants, the undisputed facts also show that the portion of the Addendum relied on by Defendants only applies "[d]uring the term of the Franchise Agreements . . . ." Walker Decl. Ex. X. Accordingly, any fees owed under the Addendum would no longer be owed once the Water Mill Franchise Agreements terminated. It appears that the Water Mill Plaintiffs are pursuing conversion damages only for Design Center Royalties. Questions of fact as to what was paid remain.

Defendants' motion for summary judgment as to the Fifteenth Claim is denied.

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I.    New York State Franchise Sales Act

The Arizona Plaintiffs assert three claims under the New York's Franchise Sales Act (the "FSA") set forth in the Seventh, Eighth, and Ninth Claims.[13] They move for summary judgment only as to the Seventh and Eighth claims. Defendants, on the other hand, move for summary judgment dismissing all three FSA claims. The Court addresses the motions together.

---

[13]    While both sets of Plaintiffs sold fruit bouquets, the Arizona Plaintiffs never signed a Fruit Bouquet franchise agreement, while the Water Mill Plaintiffs did. Nonetheless, it is only the Arizona Plaintiffs who make a claim under the FSA.

Before addressing the merits of each individual claim, the Court must resolve the threshold issue of whether the Arizona Plaintiffs are franchisees under the FSA. The Court is mindful that New York courts construe the New York FSA broadly, in light of the fact that "New York's definition of a franchise [is] considered among the broadest in the country." Nature's Plus Nordic A/S v. Natural Organics, Inc., 980 F. Supp. 2d 400, 416 (E.D.N.Y. 2013) (quoting Aristacar Corp. v. Attorney General, 143 Misc.2d 551, 552, 541 N.Y.S.2d 165 (Sup. Ct. 1989). It is undisputed that the Arizona Plaintiffs never signed any agreements related to the Fruit Bouquet line of business. However, they did purchase a "Starter Kit" that was required to sell Fruit Bouquets, construct a fruit kitchen to sell Fruit Bouquets, underwent training on how to make Fruit Bouquets, and fulfilled Fruit Bouquet orders. Further, Defendants agree that Fruit Bouquets is a franchise.

Defendants argue that the Arizona Plaintiffs cannot be considered "Franchisees" within the meaning of the FSA because they (1) refused to sign the written franchise agreement and (2) did not pay a franchise fee. Defendants are incorrect.

First, the law does not require the Arizona Plaintiffs to sign a written agreement. N.Y. Gen. Bus Law § 681 (3) defines "Franchise" as:

> [A] contract or agreement, either express or implied, whether oral or written, between two or more persons by which: (a) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by franchisor, and the franchisee is required to pay, directly or indirectly, a franchise fee, or
>
> (b) A Franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate, and the franchisee is required to pay, directly or indirectly, a franchise fee.

The FSA specifically notes that a franchise agreement may be "express or implied . . . oral or written."  N.Y. Gen. Bus Law § 681 (3).  The Arizona Plaintiffs contend that they operated under an oral agreement, an argument unaddressed by Defendants.  Instead, Defendants repeatedly state that the Arizona Plaintiffs did not sign a written agreement, a fact that is not dispositive under the plain language of the statute.  Further, it is undisputed the parties were in some sort of course of dealing through which the Arizona Plaintiffs sold Fruit Bouquets.  Viewing the evidence in the light most favorable to the Arizona Plaintiffs, it is at least a question of fact whether the Arizona Plaintiffs were in an oral franchise agreement with Defendants.

Turning to the issue of a "franchise fee," the FSA describes a "Franchise Fee" as:

> Any fee or charge that a franchisee is required to pay or agrees to pay directly or indirectly for the right to enter into a business under a franchise agreement or otherwise sell, resell, or distribute goods, services or franchises under such an agreement, including, but not limited to, any such payment for goods or services.

N.Y. Gen. Bus Law § 681(7)

The Arizona Plaintiffs argue that the Court should broadly construe the FSA and hold that a fee that they paid for the Fruit Bouquet "Starter Kit" and/or ongoing royalties paid to the Corporate Defendants on Fruit Bouquet orders constituted franchise fees. Defendants dispute whether Plaintiffs paid royalties, but do not dispute that they purchased a Starter Kit. DE 94 ¶¶ 58–59.  The undisputed facts show that the Arizona Plaintiffs purchased the Starter Kit for the right to sell the Fruit Bouquets, and then did sell Fruit Bouquets. Accordingly, viewing the evidence in the light most favorable to the Arizona Plaintiffs, the Court holds that the purchase of the Starter Kit could constitute a "franchise fee" under New York law. See N.Y. Gen. Bus Law § 681(7) (Defining a franchise fee as "any fee . . . that a franchisee is required to pay or agrees to pay directly or indirectly for the right to enter into a business) (emphasis added); see also DE 94 ¶ 58.

For the foregoing reasons, the Court rejects Defendants' argument that the Arizona Plaintiffs were not a Fruit Bouquet Franchisee and will turn to the merits of Plaintiffs' claims under the FSA.

A.     Violations of FSA Section 683: Seventh and Eighth Claims

The Arizona Plaintiffs' seventh and eighth claims allege violations Section 683 of the FSA. DE 47 at ¶¶ 129–165. The seventh claim alleges that Defendants violated the franchise regulation and disclosure requirements of the FSA by not filing Franchise Disclosure Documents ("FDDs").  Pl. Opp. at 5.  In particular, it is alleged that Defendants failed to provide FDD's to the Arizona Plaintiffs that set forth seven particular items of disclosure. These items are referred to in the Second Amended Complaint as items 2, 3, 5, 6, 7, 19 and 22. The Eighth Claim alleges that FDDs failed to include representations about data, methods and computations regarding the fruit bouquet business. DE 47 at ¶¶ 143–149. This claim also include the allegation that the failures to comply with the FSA were willful and that McCann, Nance and Marlowe aided and abetted in the violations of the FSA. The Arizona Plaintiffs do not move for summary judgment as to damages under the FSA, but allege they are entitled to rescission of their franchise agreement and to damages in an amount to be determined at trial.

Despite the particularity of pleading specific items stated to be omitted from the required FDDs, Plaintiffs' prolix memorandum of law fails to direct the Court to the statutory provision wherein each particular category is located. Nonetheless, the parties' arguments focus on whether any FDD documents were provided, and whether Defendants are exempt. The Court will therefore consider those arguments.

Defendants have submitted FDD's for the years beginning in 2011. See Walker Aff. Exhibits TT (2011); UU (2012), VV (2013), and PP (2014). All of these FDD's include

disclosures as to Fruit Bouquets, and all contain disclosures regarding the subjects set forth in the Plaintiffs' Amended Complaint. The earliest of these documents is dated September of 2011, which was six months after the March 2011 meeting where the fruit bouquet business is first alleged to have been discussed with floral franchisees, but years before the October 2014 date when the Arizona Plaintiffs appear to have become engaged in the fruit bouquet business.

The Arizona Plaintiffs appear to argue, however, that they became fruit bouquet franchisees before the filing of the September 2011 FDD — making it necessary for Defendants to have filed a 2010 FDD that included information about the fruit business. This earlier date of operation as franchisees may be the date when the Arizona Franchisees purchased the Starter Kits. This particular date, however, is unclear to the Court. This is particularly true in view of the Arizona Plaintiffs' arguably inconsistent position that the 2010 FDD is insufficient because it was filed "four years before" the Arizona Plaintiffs became franchisees. DE 86 at 30. If this is true, they have not shown anywhere that the FDD's submitted by Defendants in opposition to their motion (demonstrating the filing of FDD's from 2012–2014) are somehow insufficient. The Court also notes that Defendants have created an issue of fact as to whether prior to October of 2014 the Arizona Plaintiffs were actually engaged in their own fruit business, under the "Fantastic Fruits" name, and were not, before 2014, engaged in the business of selling fruit bouquets.

Plaintiffs' FDD registration and disclosure claims turn on the date when they became franchisees. This date presents a material issue of fact precluding summary judgment as to the Arizona Plaintiffs' Seventh and Eighth Claims. Additional material issues of fact exist as to whether Defendants were exempt from registration at the time period alleged.

The Arizona Plaintiffs' motion for summary judgment as to their Seventh and Eighth

Claims is denied.

  B.  <u>Violations of FSA Section 687: Ninth Claim</u>

Defendants seek summary judgment as to the Arizona Plaintiffs' claim pursuant to

Section 687 of the FDA — that statute's anti-fraud provisions. Section 687 makes it unlawful,

<u>inter</u> <u>alia</u>, "for any person, in connection with the offer, sale or purchase of any franchise, to

directly or indirectly: (a) employ any device, scheme, or artifice to defraud; (b) make any untrue

statement of a material fact or omit to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading

or engage in any act, practice, or course of business which operates or would operate as a fraud

or deceit upon any person. <u>See</u> N.Y. Gen. Bus. Law 687(2).

The FSA defines "fraud" or deceit more broadly than common law fraud or deceit. The

statute specifically defines fraud to include:

> a) Any deception, concealment, suppression, device, scheme or artifice employed by a
> franchisor, franchise sales agent, subfranchisor or franchise salesman to obtain any
> money, promissory note, commitment or property by any false or visionary pretense,
> representation or promise;

> (b) Any material misrepresentation in any registered prospectus filed under this article; or

> (c) The omission of any material fact in any registered prospectus filed under this article.

NY Gen. Bus. Law § 681(10).

Actions commenced under this provision of the FSA are required to be commenced

within three years of the act or transaction constituting the violation. N.Y. Gen. Bus. Law §

691(4).  This is interpreted to require any action under the FSA to be commenced within three

years of the date upon which the parties entered into their franchise agreement. <u>Kroshnyi v. U.S.</u>

<u>Pack Courier Services, Inc.</u>, 771 F.3d 93, 103–04 (2d Cir. 2014).

Plaintiffs' Section 687 claims appear to be based upon misrepresentations made and acts undertaken with respect to the issue of incremental sales, i.e., the Fruit Bouquet Misrepresentations. Defendants argue that any claims based upon such misrepresentations were made in 2011, and are therefore time-barred. The Arizona Plaintiffs argue that their claims did not arise, however, until they became franchisees in 2014. As noted, this date of commencement of becoming franchisees appears inconsistent with the Arizona Plaintiffs' claims that they became franchisees when they purchased the Starter Kits. Even if somehow consistent with their claims, it demonstrates the presence of material issues of fact as to the running of the statute of limitations. Questions of fact also exist as to the truth or falsity of the Fruit Bouquet Representations, and whether the individual defendants can be held liable.

Defendants motion for summary judgment as to Plaintiffs' Ninth Claim is denied.

II.    Plaintiffs' Motion for Summary Judgment as to Counterclaims

A.    Contract Claims

The standards for breach of contract are set forth above and apply to Defendants' counterclaims. As noted, the contract-based counterclaims that Defendants are pursuing are claims against all Plaintiffs as they relate to the failure of the plaintiffs to report and pay fees and royalties under the agreements in issue and a claim against the Arizona plaintiffs for allegedly improperly terminating the 2010 Franchise Agreement.

Defendants rely on the terms of the contracts alleged to have been breached. Plaintiffs rely on testimony developed during discovery. Upon review of testimony before the Court, the Court finds genuine issues of fact preclude summary judgment as to all of these claims. For example, in addition to Plaintiff Denham's testimony, there is defense testimony that appears to contradict the express terms of the parties' contracts.  That testimony indicates that Defendants

approved of businesses that they now allege to have been in wrongful competing businesses. <u>See</u> Walker Aff. Ex. Q at 224:17-25 (Marlowe Deposition). There is also testimony that Defendants acquiesced in decisions to close stores. <u>See</u> Walker Aff. Ex. P (Nance Deposition). These issues of fact preclude summary judgment.

Plaintiffs' motion for summary judgment dismissing Defendants' contract-based counterclaims is denied.

B.    <u>Trademark Claims</u>

Defendants' trademark claims are based upon two separate uses of their trademark. The first dispute is whether the 1-800 Flowers trademark was sufficiently removed from the Arizona Plaintiffs' storefront in 2016. The facts surrounding this dispute are clear in photographs provided in Defendants' counterclaim. DE 51 at 39. Those photographs show the Arizona Plaintiffs placed a new banner bearing the name "AZ Florist" over the "1-800 Flowers" name. However, the "AZ Florist" banner is not as wide as the "1-800 flowers" logo. Therefore, Defendants' trademark emerges from the edges of the banner placed over the old lettering as depicted below.



1.    <u>Signage Claims</u>

In order to prevail on their claim of trademark infringement Defendants must show (1) a valid mark entitled to protection under the Lanham Act; that (2) the defendant used the mark, (3) in commerce, (4) "in connection with the sale ... or advertising of goods or services," 15 U.S.C. § 1114(1)(a), (5), without the plaintiff's consent. <u>1-800 Contacts, Inc. v. WhenU.Com., Inc.</u>, 414 F.3d 400, 406–07 (2d Cir. 2005). Defendants must also show that defendants' use of that mark "is likely to cause confusion ... as to the affiliation, connection, or association of [defendant] with [plaintiff], or as to the origin, sponsorship, or approval of [the defendants'] goods, services, or commercial activities by [plaintiff]." 15 U.S.C. § 1125(a)(1)(A).

The "use" "in commerce" and "confusion" issues are three separate and distinct elements of Defendants' claim. "Use" is decided first because "while any number of activities may be 'in commerce' or create a likelihood of confusion, no such activity is actionable under the Lanham Act absent the 'use' of a trademark. To show 'use,' a plaintiff must show with respect to the sale of goods that the defendant (1) 'placed [the mark] in any manner on the goods ... and (2) the goods are sold or transported in commerce.' With respect to the sale of services, a plaintiff must show that the defendant 'used or displayed [the mark] in the sale or advertising of services and the services are rendered in commerce." Lopez v. Bonanza.com, Inc., 17 CV 8493(LAP), 2019 WL 5199431, at *8 (S.D.N.Y. Sept. 30, 2019) (citations omitted).

Plaintiffs argue that Defendants cannot show the required "use" because they cannot show that the complained of use was "on services when it is used or displayed in the sale or advertising of services . . . ." 15 U.S.C. § 1127. This is based upon the argument that the banner made clear that the Arizona Plaintiffs were no longer affiliated with 1-800-Flowers, and therefore there can be no question of fact that services and good offered within the store were not affiliated with Defendants' products. Plaintiffs also support their argument with the claim that once a consumer was actually inside their store, there were no materials bearing the 1-800-Flowers mark.

While the Court agrees that the banner outside of the store makes clear that the Arizona Plaintiffs made an *attempt* to change the outside signage, that doesn't preclude that there is a question of fact as to the use of Defendants' trademark.  Moreover, Defendants' claim, as pleaded, is actually broader than complaining only of this signage. The claim that Plaintiffs have failed to "de-identify" their store by allowing the 1-800-Flowers mark to emerge from the corners of the outside sign, is used only as an example. Defendants' counterclaim more broadly

alleges that the Arizona Plaintiffs "have not destroyed or obliterated all signage and have instead used and displayed [the protected marks and portions thereof] in connection with their business." DE 51 at 39. Thus, the banner placed over the outside sign, is referred to in the counterclaim as an "example" of the continued wrongful use of Defendants' protected marks. Id. Since, as noted above, there are questions of fact as to use, the Court cannot, as a matter of law, grant summary judgment dismissing this portion of the claim.

To be sure, it will be Defendants' burden to prove at trial, that the Arizona Plaintiffs' overall wrongful use of the protected trademark violated the Lanham Act. It may be that Defendants will not be able to show a jury any use of their trademark beyond the outside sign, or that the Arizona Plaintiffs failed to remove any protected materials from their store. It may also be clear that a consumer entering would not be confused by the sign. However, the depicted banner alone is insufficient to dismiss this broad claim of infringement as a matter of law.

Plaintiffs' motion for summary judgment to dismiss Defendants' trademark claim, with respect to the alleged continued use of Defendants' marks in the Arizona store after December 2016, is denied.

### 2.    Website Claims

The second branch of Defendants' trademark counterclaims is that the Arizona Plaintiffs wrongfully used the 1-800-Flowers mark and protected logos on their website.  The facts underlying this claim arise from the Arizona Plaintiffs' reference to an award received while they were doing business with Defendants. The logo, as the webpage below indicates, appeared in a section of the Arizona Plaintiffs' website. The Arizona Plaintiffs state that this webpage appeared on their site for approximately four months after they ceased doing business with Defendants.  During that time, the page appeared as the image below.



# ABOUT US

HOME › ABOUT US



## MISSION STATEMENT

Arizona Family Florist is not just another company. We are committed to providing high quality products and superior service to all of our customers. With a much larger set of services our family of florists is committed to building long-term relationships with vendors and customers alike. Our goal is to create a sustainable atmosphere and continue to grow the solid Reputation that Arizona Family Florist has created.

## OUR STORY

Arizona Family Florist isn't just their name, it's who they are as a company. Founded in 2000 by husband and wife team Brad and Cheryl Denham, the company started delivering everyday flower arrangements in Phoenix's east valley for 1,800 Flowers. Through hard work & dedication, Cheryl & Brad steadily grew their business to include 9 locations valley wide, with an eventual goal of opening 10-20 retail stores. Once the doors on for in 2008, they first to take advantage of their current business model and make immediate decisions about the issue & concern of the local industry and how that would affect their company. Consolidation was the answer. Instead of growing their business one store at a time, they decided to shift their focus to building the all-male floral destination in Arizona. In a bold move, they consolidated the 9 locations into a central warehouse and fulfillment location in downtown Phoenix, serving the entire Phoenix metro area. In addition to consolidation, they focused on diversifying their business with the introduction of new floral and gift products. This growth led to a pivotal point in their success. With all operations housed under one roof, the business became much more efficient and focused as the company began to make a recovery.

In 2011, after seeing an untapped need for local florists to have access to superior floral design, Cheryl & Brad made another bold move in introducing LUX Wedding Florist. While hiring a dedicated team of their own flower designers, LUX became nationally recognized for winning the coveted Society of American Florists (SAF) Sylvia Cup for Floral design in 2012. From the success of LUX, they have recently expanded the brand's inventory consolidation and design studio in the adjacent suites.

True to their entrepreneurial spirit, Brad & Cheryl found yet another untapped opportunity in the floral space, when Arizona Flower Market. Arizona's only wholesale to the public flower market. The 25,000 sq. ft. space are marked as home to a humongous 4,000 sq. ft. cooler, make greenhouse and aisle after aisle of hard goods, ribbon, design tools, etc. They refer to it as "DIY Heaven."

If you're wondering where the "Family" part comes from, aside from Brad & Cheryl being husband & wife, there also employ a son, a daughter, brother, a father-in-law and many other employees that conduct a part of their extended family. They are committed to sharing their successful and plans to branch on it valued the honesty, integrity, morals, respect and hard work.

Today Arizona Family Florist has grown to become Arizona's largest florist and is considered an innovative leader in the floral industry. Their well-rounded approach to business has served a diverse family of brands including an in-location floral delivery service, Arizona Florist, and Arizona Flower Market, a wholesale market open to the public, award-winning full service bridal & event floral design studio LUX Wedding Florist, as well as Fantasy Florist.

## RECOGNITION



As the above image makes clear, the "about us" tab of the Arizona Plaintiffs' website contains a section entitled "Recognition." That section bears the 1-800 Flowers logo and describes awards won during the years 2007–2009 and 2013. See DE 51 at 40. The webpage also bears other corporate logos, including the "FTD" logo (not owned by Defendants) and refers to an award from that organization, as well one received from a third organization. However, seven of the ten awards appearing on the webpage are 1-800-Flowers awards.

The parties agree as to the applicable law concerning fair use of Defendants' mark. Thus, counsel agree that "a defendant may lawfully use a plaintiff's trademark where doing so is necessary to describe the plaintiff's product and does not imply a false affiliation or endorsement by the plaintiff of the defendant." Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Security Universal, 823 F.3d 153, 168–69 (2d Cir. 2016) (quoting Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 102–103 (2d Cir. 2010)). "When considering a likelihood of confusion in nominative fair use cases, in addition to discussing each of the Polaroid factors, [as set forth by the Second Circuit in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir.1961)] courts are to consider: (1) whether the use of the plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service, that is, whether the product or service is not readily identifiable without use of the mark; (2) whether the defendant uses only so much of the plaintiff's mark as is necessary to identify the product or service; and (3) whether the defendant did anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the plaintiff holder, that is, whether the defendant's conduct or language reflects the true or accurate relationship between plaintiff's and defendant's products or services." Int'l Info. Sys. Sec. Certification Consortium, Inc., at 168.

Defendants argue that the Arizona Plaintiffs cannot satisfy the second prong of the nominative use test, i.e., they cannot show that they "only used so much of the mark as necessary to identify the product or service," or in this case, that they received an industry award — but are not affiliated with the entity that granted that award. DE 92 at 20. The Second Circuit has held that "[w]hen assessing the second nominative fair use factor, courts are to consider whether the alleged infringer "step[ped] over the line into a likelihood of confusion by using the senior user's mark too prominently or too often, in terms of size, emphasis, or repetition." Int'l Info. Sys. Sec. Certification Consortium, Inc., at 168.

The Court cannot say, as a matter of law, that the use of Defendants' marks did not go "over the line" allowed by fair use. That is especially true here where the Arizona Plaintiffs had previously been in business with Defendants, and continued to be engaged in the flower business as a competitor. See Courtenay Commc'ns Corp. v. Hall, 334 F.3d 210, 213 n.1 (2d Cir. 2003) (vacating dismissal of Lanham Act claims and holding nominative fair use did not supply alternative grounds for dismissal because defendant's "hyperlink connection to a page of endorsements suggests affiliation, sponsorship, or endorsement by" the plaintiff) (internal quotation marks omitted)). Under these circumstances, the Court cannot dismiss the claim.

Plaintiffs' motion for summary judgment dismissing Defendants' trademark claims with respect to the use of Defendants' marks on Plaintiffs' website is denied.

<u>CONCLUSION</u>

For the foregoing reasons the pending motions for summary judgment are granted in part and denied in part. Defendants' motion for summary judgment (appearing as Docket Entry Number 72 herein) is granted as to the claims 3, 4, 5, 6, and 14 of Plaintiffs' Second Amended Complaint. Their motion for summary judgment is denied as to claims 1, 7, 8, 9, 12, 13, and 15,

and it is granted in part and denied in part as to claims 2 and 11 of that pleading. Plaintiffs' cross-motion for summary judgment (appearing as Docket Entry Number 82 herein) is denied in its entirety.

<u>OBJECTIONS</u>

A copy of this Report and Recommendation is being provided to all counsel via ECF. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of filing of this report. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court of Appeals. <u>Thomas v. Arn</u>, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); <u>Caidor v. Onondaga Cnty.</u>, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision").


Dated:  Central Islip, New York
        February 21, 2019

                                                    /s/ Anne Y. Shields
                                                   Anne Y. Shields
                                                   United States Magistrate Judge