UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
───────────────────────────────X
ARIZONA FAMILY FLORISTS LLC, et al.,

                    Plaintiffs,

  -against-.

1-800-FLOWERS.COM, INC., et al.,

                    Defendants.
───────────────────────────────X

For Online Publication Only

**ORDER**
16-CV-2638 (JMA) (AYS)

**FILED**
**CLERK**
10:38 am, Oct 26, 2021
**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**AZRACK, United States District Judge:**

Currently pending before the Court are voluminous cross-motions for summary judgment. The Court referred these motions to Magistrate Judge Anne Y. Shields, who issued a 65-page Report and Recommendation (the "R&R"). Judge Shields recommends denying Plaintiffs' motion in entirety and granting Defendants' motion in part and denying that motion in part.

The Arizona Plaintiffs have objected to various aspects of the R&R. The Water Mill Plaintiffs, who are now represented by separate counsel, have joined in those objections. Defendants did not file any objections.

In reviewing a magistrate judge's report and recommendation, the court must "make a de novo determination of those portions of the report or . . . recommendations to which objection[s][are] made." 28 U.S.C. § 636(b)(1)(C); see also Brown v. Ebert, No. 05–CV–5579, 2006 WL 3851152, at *2 (S.D.N.Y. Dec. 29, 2006). The court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Those portions of a report and recommendation to which there is no specific reasoned objection are reviewed for clear error. See Pall Corp. v. Entegris, Inc., 249 F.R.D. 48, 51 (E.D.N.Y. 2008).

After conducting a review of the full record (including the motion papers, the R&R, and

1

objections) and applicable law, the Court adopts, with the modifications set out below, the R&R as the opinion of the Court.

I have reviewed all aspects of the R&R for which there are no specific objections and—with one exception concerning the denial of Defendants' motion for summary judgment on Plaintiffs' Seventh and Eighth claims—find no clear error in those aspects of the R&R. Accordingly, the Court adopts all of those aspects of the R&R.

I now turn to Plaintiffs' various objections.

**A. <u>Denial of Plaintiffs' Motion on Plaintiffs' Seventh and Eighth Claims</u>**

The Arizona Plaintiffs object to the R&R's recommended denial of their motion for summary judgment on their Seventh and Eighth claims under the New York State Franchise Sales Act. The R&R concluded that factual issues existed on these claims. The R&R reasoned that:

> Plaintiffs' FDD registration and disclosure claims turn on the date when they became franchisees. This date presents a material issue of fact precluding summary judgment as to the Arizona Plaintiffs' Seventh and Eighth Claims. <u>Additional material issues of fact exist as to whether Defendants were exempt from registration at the time period alleged.</u>

(R&R at 55 (emphasis added).)

In their objections, the Arizona Plaintiffs assert:

> The [R&R] . . . states that there are questions of fact about whether the Corporate Defendants were exempt from the registration requirements of New York State. There is no indication in the [R&R] of what those questions are. Indeed, it is a legal question whether the Corporate Defendants can, after-the-fact, avail themselves of an exemption on registration (despite having filed FDD registrations every year). If they can, it is a further legal question whether they are also exempt from disclosure under the case law established in the Eastern District.

(Objections at 19.)

The Arizona Plaintiffs assert that Defendants' prior conduct precludes Defendants from availing themselves of the statutory exemption from registration found in N.Y. Gen. Bus. Law §

2

684(3). Plaintiffs also contend that even if Defendants were exempt from registration, § 683(8) still required Defendants to give provide all the disclosures, mandated by § 683(2), to Plaintiffs. It appears undisputed that Plaintiffs did not receive copies of such disclosures concerning the Fruit Bouquet franchise.

I agree with Plaintiffs that the resolution of their Seventh and Eighth claims turns on legal, not factual, questions. Unfortunately for Plaintiffs, I find that they lose on both of these legal questions. Defendants' prior registrations do not preclude them from now invoking the statutory exemption from registration. Additionally, Defendants meet the requirements of that exemption. Furthermore, as explained below, I conclude, as a matter of law, that a franchisor who is statutorily exempt from registration is also excused from providing Plaintiffs with the complete statutory disclosures required by N.Y. Gen. Bus. Law § 683(2).

N.Y. Gen. Bus. Law § 684)(3) states:

> There shall be exempted from the registration provisions of section six hundred eighty-three of this article the offer and sale of a franchise if:
>
> > (a)(i) The franchisor has a net worth on a consolidated basis, according to its most recent audited financial statement, of not less than fifteen million dollars; or the franchisor has a net worth, according to its most recent audited financial statement, of not less than three million dollars and is at least eighty percent owned by a corporation which has a net worth on a consolidated basis, according to its most recent audited financial statement, of not less than fifteen million dollars; and
> >
> > (ii) The franchisor discloses in writing to each prospective franchisee, at least seven days prior to the execution by the prospective franchisee of any binding franchise or other agreement, or at least seven days prior to the receipt of any consideration, whichever occurs first, ["[t]he franchisor's principal business address and the name and address of its agent in this state authorized to receive process].

Id.; see also N.Y. Gen. Bus. Law § 683(2)(b).

The Arizona Plaintiffs assert that because Defendants actually filed registrations for 2010

3

through 2015, Defendants are somehow precluded from invoking the exemption from registration under § 684(3) for those years. This argument is meritless. The statute does not state that registration precludes a defendant from subsequently invoking this exemption provision if, as occurred here, the defendant's registration and disclosures are subsequently challenged in litigation as inadequate.

Defendants satisfied paragraph (a)(i)'s financial requirements, a point the Arizona Plaintiffs do not contest. Although the Arizona Plaintiffs do assert that Defendants have not met the additional requirement in Paragraph (a)(ii), Defendants have satisfied this requirement as well. The information required by Paragraph (a)(ii) was included in Defendants' 2010 FDD, which was provided to the Arizona Plaintiffs. The Arizona Plaintiffs argue that this disclosure in the 2010 FDD does not satisfy Paragraph (a)(ii) because the Fruit Bouquets franchises at issue were not even announced until 2011 and the Arizona Plaintiffs did not begin selling Fruit Bouquets until October 2014. This argument is not persuasive. The Arizona Plaintiffs never even attempt to explain how their proffered interpretation comports with the actual language of the statute. Under the plain language of Paragraph (a)(ii), the disclosure of the necessary information in Defendants' 2010 FDD was sufficient because it was "disclose[d] in writing" to the Arizona Plaintiffs "at least seven days" before the Arizona Plaintiffs purchased the "Starter Kit" for the Fruit Bouquets. Moreover, this interpretation also comports with the obvious purpose of Paragraph (a)(ii) as the Arizona Plaintiffs were clearly informed, in the 2010 FDD, of the necessary information required by paragraph a(ii). Not only does the Arizona Plaintiffs' interpretation fail to account for the actual language of § 684(3), but their interpretation would result in a pointless formalism that would, in the circumstances here, undermine the purpose of this disclosure requirement and the registration exemption.

The Arizona Plaintiffs also assert that, even if Defendants can invoke the statutory exemption from registration, Defendants were still required to provide the additional disclosures mandated by § 683(2) and § 683(8) to the Arizona Plaintiffs. I disagree.

N.Y. Gen. Bus. Law § 683(8) states:

> <u>A franchise which is subject to registration under this article shall not be sold without first providing to the prospective franchisee, a copy of the offering prospectus</u>, together with a copy of all proposed agreements relating to the sale of the franchise at the earlier of (a) the first personal meeting between the franchisor or its agent and the prospective franchisee, (b) at least ten business days prior to the execution of a binding franchise or other agreement, or (c) at least ten days prior to the receipt of any consideration in connection with the sale or proposed sale of a franchise.

(Emphasis added).

Here, the franchise at issue was exempt from registration and, thus, was not "subject to registration under this article." Accordingly, Defendants did not have to provide Plaintiff with an offering prospectus containing the disclosures required by § 683(8) and § 683(2). See <u>Dunkin' Donuts, Inc. v. HWT Assocs., Inc.</u>, 181 A.D.2d 711, 712, 581 N.Y.S.2d 363 (N.Y. App. Div. 2d Dep't 1992) ("Financial information supplied by Dunkin' Donuts proves that it is exempt from the specific disclosure requirements of General Business Law § 683, and was thus not required to furnish the location of competing franchises." (citations omitted)); <u>see also</u> Kaufmann, <u>Practice Commentary to N.Y. Gen. Bus. Law § Ch. 20, art. 33</u>, Refs & Annos (McKinney's Cons. Law of N.Y. 2021); Disclosure and Registration Requirements, 4E N.Y. Prac., Com. Litig. in New York State Courts § 123:4 (5th ed.).

The Arizona Plaintiffs rely on <u>Olivieri v. McDonald's Corp.</u>, 678 F. Supp. 996, 998 (E.D.N.Y. 1988), which concluded that the disclosures set out in § 683(2) and § 683(8) had to be provided to the franchisee even when the franchise was exempt from registration. However, I am not persuaded by <u>Olivieri</u>. <u>Olivieri</u> predates the Appellate Division's decision in <u>Dunkin Donuts</u>.

5

Additionally, Olivieri did not address the actual language of the statute and instead relied on a Practice Commentary, which advised that disclosure was required even when the registration exemption was triggered. Olivieri, 678 F. Supp. at 999 (quoting Kaufmann, Practice Commentary to Article 33 at 591. That Practice Commentary, however, has subsequently been revised and now indicates that disclosure is not required in that circumstance. See Kaufmann, Practice Commentary to N.Y. Gen. Bus. Law § Ch. 20, art. 33, Refs & Annos (McKinney's Cons. Law of N.Y. 2021).

Given the above, I agree with the R&R's ultimate recommendation that Plaintiffs' motion for summary judgment should be denied on Plaintiffs' Seventh and Eighth claims. However, unlike the R&R, I do not find that factual disputes preclude summary judgment. Rather, I conclude that Plaintiffs' motion for summary judgment on these claims must be denied because Defendants were exempt from registration and disclosure as a matter of law.

Defendants also moved for summary judgment on Plaintiffs' Seventh and Eighth claims. The R&R recommended denying Defendants' motion on those claims and Defendants did not object. However, because I have concluded that Plaintiffs' Seventh and Eighth claims fail as a matter of law, I must conclude that Defendants are, in fact, entitled to summary judgment on those claims.

## B. First Claim – Breach of Contract

### 1. Overview

The Arizona Plaintiffs' First Claim alleges breach of contract concerning unpaid commissions under the Arizona LFC/SFA and the Arizona OFA. This claim also seeks damages for the time periods after the terms of the Arizona LFC/SFA and the Arizona OFA expired according the explicit language in those agreements. The Arizona Plaintiffs' brief asserted, inter alia, that an implied contract existed between the parties which extended these agreements beyond

6

their formal termination dates.

The Arizona Plaintiffs object to three aspects of the R&R, highlighted below, which relate to this issue and their First Claim.

In discussing the Arizona LFC/SFA and the Arizona OFA, the R&R states:

> The Arizona LFC/SFA was entered into on June 22, 2004. By its terms, it was set to expire on June 22, 2014. There is no document before the Court extending the term of that contract. Any argument extending that term <u>is wholly dependent upon the Arizona Plaintiffs' argument that the terms of the Arizona FA, discussed below, are somehow incorporated into this contract</u>.
>
> ****
>
> By its terms, the Arizona OFA was set to expire on May 7, 2012. There is no document before the Court extending the term of that contract. Any argument extending that term <u>is wholly dependent upon Plaintiffs' argument that the Arizona FA, discussed below, somehow incorporated its term into this contract</u>.

(R&R at 8–9 (emphasis added).)

Additionally, the R&R further addressed these agreements in the context of Plaintiffs' First Claim. The R&R recommended denying Defendants' motion for summary judgment on this First Claim, but also indicated that Plaintiffs' claims for damages for this claim would be limited in certain respects. Specifically, the R&R states:

> In addition to the breach of contract claims alleging post-termination breaches (which have been rejected), both sets of Plaintiffs allege, in their first claim, the breach of contracts that were in effect at the time of the breaches. In particular, they allege that Defendants breached the Arizona LFC/FSA, the Arizona OFA, and the Water Mill OFA by failing to send a percentage of the aggregate orders received from specified zip codes to Plaintiffs. DE 47 at ¶ 49. Plaintiffs contend that Defendants breached sections 6(b) and 6(c) of the OFAs by failing to pay commissions on the gift orders fulfilled. Id. at ¶¶ 50–51. Defendants argue that part of Plaintiffs' claims are barred by the statute of limitations, and that any remaining claims are foreclosed by the parties 'agreements.
>
> As noted, six-year statute of limitations applies to the breach of contract claims. There is therefore no question therefore, that since their contracts expired in 2012, 2014, and 2015, Plaintiffs' damages claims are limited to those that arose after May 24, 2010, <u>and prior to the expiration of their respective contracts</u>.

7

(R&R at 28 (emphasis added).)

The Arizona Plaintiffs argue that the R&R erroneously limited the damages for their breach of contract claims in their First Claim. The Arizona Plaintiffs maintain that the R&R failed to address their alternative implied contract theory, which asserted that the parties' continued performance after the formal expiration of the Arizona LFC/SFA and the Arizona OFA essentially extended those agreements and, thus, governed the parties' relationship until December 2016, when the relationship ended. Defendants respond that the parties' continued dealings after these contracts expired were governed by a February 24, 2014 letter agreement Defendants sent to the Arizona Plaintiffs.

Plaintiffs' objections on this issue are overruled for the reasons set out below.

## 2. Plaintiffs Waived Their Implied Contract Argument and, In any Event, These Claims Fail on the Merits

As an initial matter, I find that the Arizona Plaintiffs waived this argument by failing to squarely raise it during the lengthy oral argument before Judge Shields. Amongst the more than 220 pages of briefing that Plaintiffs submitted, the Arizona Plaintiffs raised this implied contract theory in less than three pages of their opening brief. However, when Judge Shields endeavored, during oral argument, to understand the parties' theories and to parse the voluminous briefing in this case, the Arizona Plaintiffs never squarely argued that these two agreements were extended under an implied contract theory. During oral argument, counsel for the Arizona Plaintiffs never uttered the phrases "implied contract" or "implied-in-fact" contract in connection with this claim. Accordingly, the Arizona Plaintiffs waived this argument by not squarely and coherently raising it at oral argument.

Even if the Arizona Plaintiffs did not waive this argument, I find that the R&R's disposition

8

of the First Claim implicitly rejected this implied contract theory and I agree that this theory fails. First, Plaintiffs' proffered evidence in support of this theory is insufficient to establish an implied contract and, thus, these claims cannot survive summary judgment. Second, the existence of the BloomNet Agreement—which, unlike the other contracts at issue, remained in effect throughout the relevant time period—defeats Plaintiffs' implied contract claim. Third, the February 24, 2014 letter agreement also defeats the Arizona Plaintiffs' implied contract claim.

### 3. Plaintiffs' Complaint and Plaintiffs' Arguments

The First Claim in Plaintiffs' Complaint—for breach of contract—alleges:

48. The allegations of paragraphs 1 through 47 are hereby incorporated by reference.

49. Pursuant to the Arizona LFC/FSA, the Arizona OFA and the Fort Lauderdale OFA (collectively, "the OFAs"), the Corporate Defendants agreed to send a percentage of the aggregate orders received from specified zip codes (with a defined "current" monetary value) to the plaintiffs' respective design centers – i.e. the Arizona Design Center and the Fort Lauderdale Design Center (collectively, the "Design Centers") – for fulfillment and to pay certain commissions to the plaintiffs.

50. Specifically, pursuant to Section 6(b) of the OFAs, the Corporate Defendants agreed to pay a commission for each floral order fulfilled. This commission is set at a sum equal to a certain percentage of the "Merchandise Value" of all orders for "Floral Products" transmitted to and directly fulfilled by each plaintiff group, as those terms are defined in the OFAs.

51. In addition, pursuant to Section 6(c) of the OFAs, the Corporate Defendants agreed to pay a commission for each gift order fulfilled. This commission is set at a fixed dollar amount, mutually agreed upon from time to time, for all orders of "Gift Products" transmitted to and directly fulfilled by each plaintiff group, as that term is defined in the OFAs.

52. The Corporate Defendants have materially breached the OFAs by consistently failing to pay commissions owed to each plaintiff group for completed floral order fulfillment and gift order fulfillment.

53. On a monthly basis, the Corporate Defendants typically fail to pay each plaintiff group approximately two to three percent of amounts owed for fulfilled orders. The Corporate Defendants sometimes fail to include fulfilled orders on the monthly billing statement, sometimes apply improper amounts to orders, and sometimes

mark orders "cancelled" even though the orders were not cancelled and the products were received by the customers.

54. The net result of these practices is that the Corporate Defendants have materially breached the OFAs by chronically and consistently underpaying each plaintiff group commissions owed for floral and gift orders fulfilled pursuant to the OFAs.

55. Plaintiffs have duly performed all of the obligations on their part to be performed.

56. As a direct result of the aforementioned material breaches, the plaintiffs have been deprived of the full benefits to which they are entitled. Further, the Corporate Defendants' material breaches have released plaintiffs from their obligations to continue performance of their respective agreements with the Corporate Defendants.

(Second Am. Compl. ("SAC").)

The Complaint also alleges that "[i]f and to the extent any of the aforementioned agreements expired by their terms, the Corporate Defendants have consented to the Arizona Plaintiffs' continued operation under such agreements for additional terms." (SAC ¶ 32.)

Notably, in their First Claim, the Arizona Plaintiffs only seek recovery under the Arizona LFC/FSA and the Arizona OFA. They do not seek recovery under the BloomNet Agreement for any of the time periods at issue.

In their summary judgment brief, the Arizona Plaintiffs argued:

> It cannot be contested that the parties' conduct after June 22, 2014 (the purported "expiration" of the Arizona LFC/SFA) and after May 7, 2012 (the purported "expiration" of the Arizona OFA) included the Corporate Defendants continuing to send orders to the Arizona Plaintiffs, the Arizona Plaintiffs continuing to fill them, and the Corporate Defendants continuing to send them payment in accordance with the terms of their written agreements, through the end of their business relationship on December 1, 2016. *See* Denham Declaration at ¶ 13. This shows a contract implied in fact with substantially the same terms and conditions as embodied in the expired written contract.

(Pl. S.J. Mem. at 83, ECF No. 86).)

Paragraph 13 of the Denham Declaration asserts, in conclusory fashion, that "[t]he

10

Corporate Defendants continued to send us orders, we continued to fill them, and they continued to pay us in accordance with the terms of our written contracts, through the end of our business relationship on December 1, 2016. (Denham Declaration ¶ 13.).

The Arizona Plaintiffs also argue that an October 2016 letter from Defendants is further proof of an implied contract. The October 2016 letter simply informed the Arizona Plaintiffs that, as of December 1, 2016, Defendants would cease sending the Arizona Plaintiffs orders for fulfillment.

### 4. Standard for Implied Contracts

Under New York law,

> A contract implied in fact rests upon the conduct of the parties and not their verbal or written words. Thus, the theories of express contract and of contract implied in fact are mutually exclusive. Whether an implied-in-fact contract was formed and, if so, the extent of its terms involve factual issues regarding the intent of the parties and the surrounding circumstances.

Watts v. Columbia Artists Mgmt. Inc., 188 A.D.2d 799, 800–01, 591 N.Y.S.2d 234, 236 (N.Y. App. Div. 3d Dep't 1992) (citations omitted). "'The parties' conduct after the expiration of a written contract, including a party's continued rendition of services, the other party's acceptance of those services and payment in accordance with the terms of the written contract' can 'establish a contract implied in fact with substantially the same terms and conditions as embodied in the expired written contract . . . .'" Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd., 157 F. Supp. 3d 352, 365 (S.D.N.Y. 2016), aff'd, 850 F. App'x 38 (2d Cir. 2021) (quoting Watts, 188 A.D.2d 799, 591 N.Y.S.2d 234, 236) (internal marks and alterations omitted).

### 5. Plaintiffs' Implied Contract Claims are Deficient

As discussed infra, Plaintiffs' implied contract claims are defeated by both the BloomNet Agreement and the February 14, 2014 letter agreement. Moreover, even putting those agreements

11

aside, the evidence cited by Plaintiffs in their briefing of this issue is insufficient to establish the existence of any implied contracts.

Critically, the Denham Declaration provides no factual details in support of its conclusory claim that Defendants "continued to pay [the Arizona Plaintiffs] in accordance with the terms of our written contracts." The Denham Declaration does not identify what compensation the Arizona Plaintiffs received for any orders they filled. Nor does the Denham Declaration identify the specific written contracts at issue, or the specific provisions therein. Although it is undisputed that Defendants continued to send the Arizona Plaintiffs orders and the Arizona Plaintiffs continued to fill them, that alone is insufficient to establish either the Arizona LFC/SFA or the Arizona OFA were extended under a theory of implied contract.[1] A reasonable jury could not find, based on the evidence cited by Plaintiffs (including the barebones October 2016 letter), that any implied contract existed. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' implied contract claims. Moreover, as explained below, the existence of the BloomNet Agreement and the February 14, 2014 letter also make clear that Plaintiffs' implied contract claims are untenable.

### 6. The BloomNet Agreement Defeats Plaintiffs' Implied Contract Claims

Defendants argue that a February 14, 2014 letter agreement governed the parties' relationship after the expiration of the Arizona LFC/SFA in June 2014. As explained infra, I agree. In any event, even accepting arguendo Plaintiffs' argument that the February 14, 2014 letter should be disregarded, Plaintiffs' implied contract claim would still fail. The factual record—including the BloomNet Agreement, which was still in effect throughout the relevant period and addressed

---

[1] In their briefing on this issue, the Arizona Plaintiffs did not explicitly rely on the amount of orders they received from Defendants as a basis for their implied contract claims. I note that in their 56.1 statement, the Arizona Plaintiffs imply that that terms of the Arizona LFC/SFA and the Arizona OFAs were extended because, after the formal expiration of these agreements, Defendants continued to provide the Arizona Plaintiffs with over $3 million per year in customer orders, as they had done since 2010. Even taking those facts into account, the Arizona Plaintiffs have not offered sufficient evidence of an implied contract because they failed to offer evidence establishing that Defendants "continued to pay [the Arizona Plaintiffs] in accordance with the terms of" the expired written contracts.

the issue of commissions—defeats Plaintiffs' claim that the parties' conduct extended the expired agreements as a matter of implied contract.

It is first helpful to briefly review three relevant agreements and the evidence in the record concerning the commission payments made to the Arizona Plaintiffs between May 2012 and December 2016. Three agreements addressed the issue of commissions and the payment of those commissions—the Arizona LFC/SFA, the Arizona OFA, and the BloomNet Agreement.

The Arizona LFC/SFA was an agreement between 1-800-Flowers.com Franchise Co., Inc. and the Denhams, which they entered into in June 2004. By its terms, the Arizona LFC/SFA expired in June 2014. The Arizona LFC/SFA states that:

> For the satisfactory performance of OPERATOR's services hereunder, 1-800-Flowers shall pay OPERATOR a sum equal to **69.5%** of the "Merchandise Value" of orders for "floral products" transmitted by 1-800-Flowers to OPERATOR and which are directly fulfilled by OPERATOR through the Local Fulfillment Center (the "Floral Fulfillment Fee"). For purposes of this Agreement, "floral products" means fresh cut flowers, plants, add-ons such as balloons and plush, and fruit and gourmet gift baskets. The term "Merchandise Value" shall mean the gross sales price of the order, less all taxes, service, shipping, handling and relay charges, credits, charge backs, gift certificates and refunds. Payment of Floral Fulfillment Fees shall be made within thirty (30) days after the end of the calendar month for orders for floral products made within such calendar month.

(Arizona LFC/SFA § 5(b) (emphasis added).)

The Arizona OFA was an agreement between BloomNet and the Denhams, which they entered into in May 2007. By its terms, the Arizona OFA expired in May 2012. The Arizona OFA states that:

> For the satisfactory performance of OPERATOR's services hereunder, 1-800-Flowers[2] shall pay OPERATOR a sum equal to **71.0%** of the "Merchandise Value" of orders for "Floral Products" transmitted by 1-800-Flowers to OPERATOR and which are directly fulfilled by OPERATOR through the Retail Store or Unit (the "Floral Fulfillment Fee"). For purposes of this Agreement, "Floral Products" means fresh cut flowers, plants, add-ons such as balloons and plush, and fruit and

---

[2] In the Arizona OFA, BloomNet, Inc. is defined as "1-800-Flowers."

13

> gourmet gift baskets. The term "Merchandise Value" shall mean the gross sales price of the order, less all taxes, service, shipping, handling and relay charges, credits, charge backs, gift certificates and refunds. Payment of Floral Fulfillment Fees shall be made within thirty (30) days after the end of the calendar month for orders for floral products made within such calendar month.

(Arizona OFA § 6(b) (emphasis added).)

The BloomNet Agreement was an agreement between BloomNet and Denham. The BloomNet Agreement contains no expiration date and, thus, was in effect, during the relevant time period between May 2012 and December 2016. The BloomNet Agreement states:

> Filling florists are entitled to seventy-three (73%) of the "gross sales price" of all incoming BloomNet order from other BloomNet Florists and **seventy-one (71%) of the "gross sales prices" of all incoming "1-800-FLOWERS.COM" orders**. The term "gross sale price" shall mean the dollar amount of the merchandise orders transmitted during the preceding calendar month and shall not include money refunded to customers or the amount of any sales taxes or other taxes collected from customers and paid over to governmental authorities or the amount of any service, shipping or handling charge.

(BloomNet Agreement (emphasis added).)

As explained earlier, although the Arizona Plaintiffs allege that they were paid in accordance with the terms of the expired Arizona LFC/SFA and Arizona OFA, they have not identified what commission-based compensation they received from Defendants between May 2012 and December 2016. Nevertheless, the record does include some evidence on this point. Plaintiffs' own expert damages report states that the Arizona Plaintiffs received an average of 71% of the gross merchandise value of orders between May 2010 and December 2016. (See Expert Report of Gary Rosen at 10 n.52.) This evidence and the BloomNet Agreement—which remained in effect throughout the relevant time period—defeats Plaintiffs' implied contract claims.

First, this is not a situation where there was no express contract governing the subject of commission payments. Here, the BloomNet Agreement addressed the subject of commissions and was in effect throughout the relevant period. As such, the Arizona Plaintiffs' contention that the

14

payments they received during this period were made pursuant to implied contracts—rather than pursuant to the BloomNet Agreement—is simply untenable. "When an agreement expires by its terms, if, <u>without more</u>, the parties continue to perform as theretofore, an implication arises that they have mutually assented to a new contract containing the same provisions as the old." <u>Martin v. Campanaro</u>, 156 F.2d 127, 129 (2d Cir. 1946) (emphasis added). Here, however, there is an important "more"—the BloomNet Agreement, which was still in effect after the expiration of the Arizona LFC/SFA and the Arizona OFA.

Second, the evidence in the record concerning commission payments during the relevant time period—meager as that evidence is—further shows that these payments were made pursuant to the BloomNet Agreement and not pursuant to any implied contract based on the expired agreements.

As for Plaintiffs' implied contract claim concerning the Arizona LFC/SFA, there is no evidence in the record indicating that, after June 2014, Plaintiffs were paid in accordance with the terms of the Arizona LFC/SFA. Plaintiffs have not pointed to any evidence in the record showing that, after the expiration of the Arizona LFC/SFA, they were paid at the 69.5% commission rate set out in the Arizona LFC/SFA. In fact, Plaintiffs' own expert report states that Plaintiffs received 71% commissions between May 2010 and December 2016. (<u>See</u> Expert Report of Gary Rosen at 10 n.52.) Under the circumstances, a reasonable jury could not infer that the Arizona LFC/SFA was extended under an implied contract theory when there is no evidence that, after the Arizona LFC/SFA expired, the Arizona Plaintiffs were paid at the commission rate set out in the Arizona LFC/SFA. The only relevant evidence in the record shows that the Arizona Plaintiffs were instead paid the higher 71% commission rate that is set out in two other agreements—the Arizona OFA and the BloomNet Agreement. I now turn to those two agreements.

15

Both the Arizona OFA and the BloomNet Agreement provided for the Arizona Plaintiffs to be paid a 71% commission rate for floral orders. While the Arizona OFA explicitly states that it expires in May 2012, the BloomNet Agreement contained no expiration date. As such, a jury could not conclude that these commission payments were made pursuant to the expired Arizona OFA when the BloomNet Agreement was in effect throughout the relevant time period.[3]

In sum, the BloomNet Agreement defeats the Arizona Plaintiffs' theory that the Arizona LFC/SFA and Arizona OFA continued, under an implied contract theory, to govern the issue of commission payments after the formal expiration of those agreements in May 2012 and June 2014.[4]

### 7. The February 24, 2014 Letter Also Defeats Plaintiffs' Implied Contract Claims

Not only does the BloomNet Agreement defeat Plaintiffs' implied contract theory, but that theory is also undermined by the February 24, 2014 letter agreement which Defendants sent to Plaintiff. The February 24, 2014 letter states:

> As you are aware, the term of your BloomNet Order Fulfillment Agreement dated June 22, 2004 shall end on June 22, 2014. BloomNet hereby provides you with written notice that your Bloom Net Order Fulfillment Agreement shall not be renewed. Notwithstanding this fact, we would like to be in a position to continue to send you orders for fulfillment, within BloomNet's sole and absolute discretion, upon the following terms and conditions, effective June 23, 2014:
>
>     (l) Your continued membership in BloomNet;
>
>     (2) Compliance with all then-current BloomNet polices [sic] and procedures;

---

[3] The fact that BloomNet was a party to both the expired Arizona OFA and the BloomNet Agreement further undermines Plaintiffs' implied contract claim.

[4] The Arizona LFC/SFA and Arizona OFA also provide for commissions on "Gift" orders. However, Plaintiffs' briefing, 56.1 statements, and damages report do not include any information concerning the compensation that the Arizona Plaintiffs received for "Gift" orders after the expiration of the two contracts at issue. The only potentially relevant evidence on this point is the notation in Plaintiffs' expert report which states that Plaintiffs were paid "an average of 71% of the gross merchandise value." The expert report does not indicate what products are included in this calculation and never separately references the payments Plaintiffs received for gift orders.

>(3) Compliance with all then-current BloomNet order fulfillment requirements;
>
>(4) For satisfactory performance, BloomNet shall pay you a Commission equal to 71.0% of the Merchandise Value of the Orders transmitted by BloomNet to you for direct fulfillment. "Merchandise Value of the Orders" shall mean the gross sales price of the order, less all taxes, service charges, credits, chargebacks and refunds. You shall not be paid any Commission for any orders delivered to a consumer in replacement of a prior order, if it is determined, in the sole judgment of BloomNet, that the prior order was not timely and/or satisfactorily fulfilled by you. In addition, you shall be solely responsible for the cost of any such replacement order and for any other costs, claims, damages, expenses (including attorney's fees) and losses resulting directly or indirectly from, or pertaining to, the original order and the replacement order;
>
>(5) An Incoming Order Transmission Fee of $2.25 for each order transmitted by BloomNet to you;
>
>\*\*\*\*
>
>If you are in agreement with the above, please sign where indicated below and return to me within ten (10) days from the date of this letter.

(February 14, 2014 Ltr.)

Defendants maintain that this letter governed the parties' relationship after June 23, 2014. The Arizona Plaintiffs assert that they could not have accepted this new agreement via their conduct because the letter asked them to sign if they agreed to the terms. Plaintiffs, however, do not cite to any authority on this point and a reasonable jury would have to conclude that Plaintiffs' continued performance after their receipt of this letter constituted acceptance of these terms. Notably, this letter made clear that the earlier agreement would not be renewed and offered the Arizona Plaintiffs new terms to continue receiving orders. After receiving this letter, Plaintiffs continued to fill orders from Defendants. (It also appears that Plaintiffs simply stayed silent in the face of this letter and never informed Defendants that they did not agree to Defendants' new terms). The Arizona Plaintiffs' argument that, under the circumstances here, these terms did not govern

the parties' relationship going forward is not persuasive.[5]

### C. Defendants' Counterclaims

The Arizona Plaintiffs argue that the R&R failed to address their statute of limitations arguments concerning Defendants' Counterclaims. After oral argument, Defendants withdrew certain counterclaims and refined the scope of their remaining counterclaims. It does not appear that any of the remaining counterclaims are completely barred by the statute of limitations. I decline to parse each of these counterclaims at this point in time to determine which "aspects of th[ose] counterclaims . . . accrued prior to May 24, 2010." (See, e.g., Pls.' S.J. Mem. at 33.) These statute of limitations issues can more appropriately be addressed at the pretrial conference or at trial. Defendants are warned not to press any frivolous aspects of their claims that are barred by the statute of limitations.

The Arizona Plaintiffs also argue that Defendants' counterclaims fail because Defendants failed to abide by contractual notice and cure provisions. This argument is meritless. The notice and cure provisions—which Plaintiffs conspicuously avoid quoting in their papers—do not preclude Defendants' counterclaims here. For example, the notice and cure provisions in the Arizona FA appear to apply only where the Franchisor seeks to automatically terminate the agreement based on certain defaults. However, these provisions also reserve, to the Franchisor, "all other remedies available to it at law or in equity." (Arizona FA at 45–46.)

### D. Remaining Objections

I have considered all of Plaintiffs' remaining objections and overrule those objections.

---

[5] Even if the Arizona Plaintiffs' conduct was insufficient to constitute acceptance of the terms of the February 14, 2014 letter, as explained above, the existence of the unexpired BloomNet Agreement defeats Plaintiffs' implied contract claims.

E. **Conclusion**

The Court adopts—with the modifications set forth above— the R&R as the opinion of the court and rules on the pending motions as follows:

- Defendants' motion for summary judgment as to the First Claim (for breach of contract) is DENIED, except for the limitations on this claim set out in the R&R.

- Defendants' motion for summary judgment as to Second Claim (for breach of the covenant of good faith and fair dealing), is GRANTED in part and DENIED in part.

- Defendants' motion for summary judgment as to the Third Claim (for common law unfair competition) is GRANTED.

- Defendants' motion for summary judgment as to the Fourth, Fifth and Sixth Claims (for breach of contract) is GRANTED.

- Defendants' motion for summary judgment as to the Seventh and Eighth Claims (for violation of the New York State Franchise Sales Act) is GRANTED.

- Defendants' motion for summary judgment as to the Ninth Claim (for violation of the New York State Franchise Sales Act) is DENIED.

- Defendants' motion for summary judgment as to the Tenth Claim (for violation of the Arizona Consumer Fraud Act) is DENIED.

- Defendants' motion for summary judgment as to the Eleventh Claim (for violation of the Florida Deceptive and Unfair Trade Practices Act) is GRANTED in part and DENIED in part.

- Defendants' motion for summary judgment as to the Twelfth Claim (for common law fraud) is DENIED.

- Defendants' motion for summary judgment as to the Thirteenth Claim (for common law negligent misrepresentation) is DENIED.

- Defendants' motion for summary judgment as to the Fourteenth Claim (for common law fraudulent inducement) is GRANTED.

- Defendants' motion for summary judgment as to the Fifteenth Claim (for conversion) is DENIED.

- Defendants' motion for summary judgment as to the Seventeenth, Eighteenth and Nineteenth Claims (for accounting, declaratory judgment and permanent injunction) is DENIED without prejudice to renew, as these "claims for relief" are

not separate causes of action.  If Plaintiff prevails at trial, these forms of relief may be granted, if appropriate, but they do not state a claim for separate causes of action, and are certainly not proper for summary adjudication.

• Plaintiffs' motion for summary judgment is DENIED in its entirety, including as to the Seventh and Eighth Claims (for violation of the New York State Franchise Sales Act) and as to Defendants' counterclaims.

This case is respectfully referred to Magistrate Judge Shields to explore the possibility of settlement.  If settlement is not possible, Judge Shields shall set a date for submission of a joint pre-trial order in accordance with my individual rules.

**SO ORDERED.**

Dated: October 26, 2021
Central Islip, New York

                                                                         /s/ (JMA)
                                          JOAN M. AZRACK
                                          UNITED STATES DISTRICT JUDGE